**ALEA LONDON LIMITED, Appellant,**

v.

**BONO–SOLTYSIAK ENTERPRISES, d/b/a Laclede Street Bar & Grill, Kenneth Weger, and Theresa Weger, Respondents.**

No. ED 85316.

Missouri Court of Appeals,
Eastern District,
Division One.

Jan. 17, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 2, 2006.

Application for Transfer Denied
April 11, 2006.

Laurel Stevenson, Nikki Cannezzaro, Springfield, MO, for Appellant.

Frank N. Carter, Jr., St. Louis, Elkin L. Kistner, Adam R. Lorenz, Clayton, MO, for Respondent.

PATRICIA L. COHEN, Judge.

### Introduction

Alea London Limited appeals from a judgment in favor of Bono–Soltysiak Enterprises d/b/a Laclede Street Bar and Grill ("Laclede Street"), Kenneth Weger and Theresa Weger ("the Wegers") on Alea London's First Amended Petition for Declaratory Judgment and/or Reformation and Judgment on an Insurance Policy. We affirm.

### Statement of the Facts and Proceedings Below

Alea London, a surplus lines insurer based in London, England, commenced covering Laclede Street on December 20, 2001.[1] Evidence of the coverage was contained in a document faxed by Jaeger + Haines, Alea London's Arkansas broker and general agent, to Midwest Agency, Laclede Street's insurance broker. This document contained, among other things, a written description of the amount of the coverage, the premium, and the liability limits. In addition, the document specifically referenced a "condition": "Excludes Assault & Battery."

On January 3, 2002, Michael Metzger, a Laclede Street patron, fatally stabbed Michael Weger in the parking lot of Laclede Street. Mr. Metzger was later convicted of involuntary manslaughter and armed criminal action in connection with Mr. Weger's death. On January 16, 2002, Jaeger + Haines issued the policy to Laclede

1. A surplus lines insurer is a "non-admitted insurer" within the meaning of Section 384.015 RSMo.2000. Non-admitted insurers are not licensed to do business in Missouri. Surplus lines insurance has been described as a "last resort for the placement of liability or property insurance on unusual risks." Eric Mills Holmes & Mark S. Rhodes, *Holmes' Appleman on Insurance 2d Treatise Guide,* Section 2.17 at 325–26 (1996). A recent journal article described surplus lines insurance as follows:

   Surplus lines have traditionally filled a critical void by providing coverage that the admitted market could not because of re-strictions on rates and forms. Surplus insurers are not bound by those restrictions and are free to customize rates and forms for each risk insured.
   . . .
   Moreover, surplus insurers are not held to the same disclosure requirements as admitted insurers, making it more difficult for consumers to determine the exact nature of the risks assumed when purchasing from a surplus carrier.

   K. Michael Fandel, David M. Byers & Paul M. Hummer, *Recent Developments in Excess, Surplus Lines, and Reinsurance Law,* 36 Tort & Ins. L.J. 301 (Winter 2000).

Street.[2] The policy identified the effective coverage period as December 20, 2001 to December 20, 2002. The business description found on the common declarations page identified Laclede Street as a restaurant. Likewise, the premium section of the declarations page classified Laclede Street as a restaurant "with no sale of alcoholic beverages—without dance floor."

The January 16 policy included a liquor liability exclusion which provided as follows:

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, securing or furnishing alcoholic beverages.

The policy also contained an attached "Combination Endorsement—1" ("the Endorsement") which materially altered the policy by, among other things, deleting and replacing the "Expected or Intended Inju-

ry" exclusion in the main body of the policy, and provided as follows:

Exclusion—Assault or Battery

Exclusion a. of Coverage A (Section 1) is deleted and replaced with the following: "Bodily injury" or "property damage":

(1) expected or intended from the standpoint of any insured;

(2) arising out of assault or battery, or out of any act or omission in connection with the prevention or suppression of an assault or battery; or

(3) arising out of charges or allegations of negligent hiring, training, placement or supervision.

On August 22, 2002, Mr. Weger's parents, Kenneth and Theresa Weger, filed a wrongful death suit against Laclede Street.[3] Upon being tendered the defense of the lawsuit, Alea London issued a reservation of rights letter agreeing to undertake defense of the lawsuit. Shortly thereafter, Alea London filed a Petition for Declaratory Judgment seeking a determination that the Alea London policy issued to Laclede Street subsequent to Mr. Weger's death did not cover the Wegers' claims. Alea London attached the policy at issue to its Petition. Alea London thereafter moved for summary judgment. Following the trial court's denial of summary judgment, Alea London filed a First Amended Petition, added allegations that it made a mistake in classifying Laclede

---

**2.** The trial court found that there was no evidence that the policy was delivered to Laclede Street. The trial court also found that Laclede Street was not supplied with a certificate in compliance with Section 384.036.4 RSMo. informing the insured of, among other things, the exclusions and endorsements which "would regularly be included in the policy."

**3.** The Wegers alleged, among other things, that their son was "attacked and stabbed to death by a patron of [Laclede Street's]." The Wegers also alleged that Laclede Street was negligent in at least three ways: (1) permitting excessive underage drinking on its premises; (2) permitting brawling and fighting on its premises; and (3) failing to provide adequate security to prevent hostile acts towards its customers. In addition to compensation for their injuries, the Wegers also sought punitive damages.

Street as a "restaurant which did not serve any alcohol" and sought reformation of the policy to show "the proper business description as a restaurant serving less than 75% alcoholic beverages."

At trial, Alea London proffered an expert witness, Peter Hans, to discuss the significance and effect of, among other things, the assault and battery exclusion contained in the Endorsement. Mr. Hans testified that the Endorsement contained language that was standard, but acknowledged there were multiple versions of assault and battery exclusions used in the surplus lines industry. By contrast, Laclede Street offered testimony through its expert, William Hagar, that the language in the Endorsement was not "mainstream" and was "draconian." In addition, Dean Brown, the Midwest Agency broker who obtained the Alea London policy, testified that the surplus lines industry used several different types of assault and battery exclusions and the binder provided no direction regarding which assault and battery exclusion would be used in the policy. Moreover, the trial court heard testimony that Laclede Street subsequently obtained a surplus lines policy that did not contain the type of restrictive exclusion described in the Endorsement.

Following the trial, the trial court issued a judgment in favor of Laclede Street and the Wegers. The trial court determined that the written document faxed by Jaeger + Haines to Midwest Agency constituted a binder of coverage for Laclede Street for the period of December 20, 2001 until December 20, 2002. The trial court concluded, as a matter of law, that the binder was the "operative insurance contract," ac-

knowledging, however, that in general, a binder may be governed by the terms of a later issued policy "only if the policy in question is a 'standard ... of policy,' " [sic] citing *Pape v. Mid–America Preferred Insurance Co.*, 738 S.W.2d 882, 884 (Mo.App. W.D.1987). The trial court declined to incorporate the language contained in the Endorsement into the binder on the grounds, in essence, that the evidence adduced at trial was insufficient to establish that such an exclusion was a standard policy term in the surplus lines industry. The trial court further found that the assault and battery term included in the binder was ambiguous and should be construed against Alea London. Finally, the trial court determined that the binder did not contain a liquor liability exclusion and that the policy, as written, "rendered the alcohol liability exclusion a nullity."

The trial court considered and rejected Alea London's request for reformation of the contract. In particular, the trial court noted that there was no evidence adduced at trial that Laclede Street participated in or contributed to the "mistake." This appeal followed.

### *Standard of Review*

We affirm the judgment of the trial court when there is no substantial evidence to support it, it is against the weight of the evidence or the trial court erroneously declared or applied the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *See also, Knipp v. Truck Ins. Exchange*, 857 S.W.2d 281, 284 (Mo.App. W.D.1993)(stating coverage disputes tried to the court are governed by *Murphy v. Carron* ).[4] We defer to the trial court's

---

**4.** Several times in its brief, Alea London states that because this dispute arises out of the interpretation of an insurance contract, our review is *de novo,* citing *Southeast Bakery Feeds v. Ranger Ins. Co.,* 974 S.W.2d 635, 638

(Mo.App. E.D.1998). *Southeast Bakery* was an appeal of a summary judgment and thus our review was *de novo.* In addition, as we stated in *Southeast Bakery, "where the underlying facts are not in question,* disputes arising

factual findings, giving due regard to the trial court's opportunity to judge the credibility of witnesses. *Peet v. Randolph,* 157 S.W.3d 360, 363 (Mo.App. E.D.2005). We review the evidence and reasonable inferences in the light most favorable to the judgment, disregarding contrary evidence and inferences. *Consumer Finance Corp. v. Reams,* 158 S.W.3d 792, 795 (Mo.App. W.D.2005). With respect to resolution of contractual ambiguities, we are faced with a question of law and our review is *de novo. Leventhal v. Trustmark Ins. Co.,* 39 S.W.3d 46, 50 (Mo.App. E.D.2001).

### Discussion

#### A. Construction of the Binder

Alea London contends in its first point[5] that the trial court erred in disregarding the terms, conditions and exclusions contained in the Alea London policy issued on January 16, 2002.[6] More specifically, Alea London contends the later-issued policy "contains the entire agreement between the parties." Laclede Street and the Wegers contend, *inter alia,* that: (1) the assault and battery exclusion contained in the policy was not part of the binder because it was not a standard or usual term; (2) the reference in the binder to a "condition" which "excludes assault and battery" was ambiguous and should be construed against Alea London; and (3) the liquor liability exclusion did not apply to Laclede Street because the policy expressly classified Laclede Street as a restaurant.

▉ Missouri courts recognize that parties may enter into a temporary contract of insurance, known as a binder. *Hay v. Utica Mut. Ins. Co.,* 551 S.W.2d 954 (Mo.App.Spring.Dist.1977). A binder may be "sketchy and informal in comparison with the policy contemplated for issuance and delivery in the future, [but] it is a contract of insurance *in praesenti,* subject only to the conditions which it itself imposes." *Couch on Insurance* 3d Section 13:1. When a loss occurs after coverage has been bound but before the issuance of a policy, the question of the scope of coverage is resolved by determining the amount of coverage contemplated by the binder. *See Hay,* 551 S.W.2d at 957 ("suit here is based on the binder not on the policy"); *Pape,* 738 S.W.2d at 882 ("the issue in the case and the dispute between appellants and respondent was the amount of coverage which the insurance binder provided for silverware"); *World Trade Center Properties L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 169 (2nd Cir.2003)(a binder is "an enforceable contract in its own right") Thus, the trial court did not err when it considered the binder to be the "operative insurance contract" for purposes of determining coverage with respect to the claims in the Wegers' lawsuit.

▉ Certain binders expressly incorporate by reference the terms of the policy to be issued. *See Pape,* 738 S.W.2d at 883. ("The binder also included the following statement: This insurance is subject to the terms, conditions and limitations of the policy(ies) in current use by the Compa-

---

from the interpretation and application of insurance contracts are matters of law for the court." *Id.* (emphasis added). Here the appeal follows a trial on the merits.

5. Because Alea London's first three points are intertwined, we consider them together.

6. At trial Alea London apparently argued that the document Jaeger + Haines faxed to Mid-

west Agency did not constitute a binder. Alea London acknowledges here that "there is no dispute that [it] agreed, over the telephone, to bind coverage for Laclede ..." Other than referring to the faxed document as a "claimed binder," Alea London does not contend that the trial court erred in concluding that the faxed document constituted a binder.

ny.") When a binder expressly incorporates policy conditions by reference, there is no question that, to the extent terms sought to be incorporated are standard or "usual," the binder should be interpreted to include such terms. *Id.* Thus, when construing the contents of the binder, courts first look to "the specific terms contained in the binder or incorporated by reference" and then, only to the extent necessary as a "gap-filler," turn to the policy to ascertain "usual" terms or those required by statute. *World Trade Center,* 345 F.3d at 169 (applying New York law). As one court succinctly summarized in a recent opinion, "... if terms may fairly be characterized as 'usual' or 'stereotypical,' they form a part of the policy even if not referred to in the binder; if not, not." *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela,* 802 F.Supp. 1069, 1076 (S.D.N.Y.1992), *rev'd on other grounds,* 991 F.2d 42 (2d Cir. 1993). Likewise, as another court recently stated:

> In the insurance context, when a loss occurs after a binder has been issued, but before a policy is written, the insurer is bound to provide coverage in line with its standard policies *referenced in the binder, or policies standard throughout the industry.*

*Pine Ridge Realty, Inc. v. Massachusetts Bay Ins. Co.,* 752 A.2d 595, 599 (Me.2000). (citations omitted) (emphasis added).[7]

The rationale for limiting implied terms to those that are "usual" or "stereotypical"

was cogently articulated in *Hilt Truck Lines, Inc. v. Riggins,* 756 F.2d 676, 678 (8th Cir.1985):

> ... if binders are always to be read as including all of the limitations and exclusions that may turn up in the written policy when eventually issued, and if this rule is applied even to written policies issued after the occurrence of a loss, then the oral contract can be rendered completely nugatory by the unilateral act of one party to it, the insurance company.

Moreover, courts that recognize that it is appropriate to condition a binder by "limitations usual to the contemplated" coverage do so because of an assumption that "many policy clauses are either stereotypes or mandated by public regulation." *Westchester Resco Co., L.P. v. New England Reinsurance Corp.,* 648 F.Supp. 842, 845 (S.D.N.Y.1986). Here, however, we are dealing with a surplus lines insurer whose policies are not regulated by the State of Missouri and may "customize rates and forms for each risk insured." *See* fn. 1, supra.[8] Thus, the existence of "stereotypes" and/or standard forms which are part of a regulated commercial general liability policy and support the implication of standard terms into the binder, are not necessarily the norm in the surplus lines industry.

### 1. *Does the binder term "Condition: Excludes Assault & Battery" exclude coverage for claims asserted in the Wegers' lawsuit?*

---

7. Although in its point relied on Alea London argues that the "policy contains the entire agreement between the parties," it appears to acknowledge in the body of its argument, the significance of the *Pape* decision, which looks first to the binder and then to the policy terms, if standard or usual.

8. Alea London appears to argue, somewhat disingenuously, that because it *may* use a

standard form, at its option, and because Missouri has enacted legislation that relates to the procurement of surplus lines coverage, it should be treated identically to an admitted insurer. However, nowhere does Alea London state that it is bound by statutory restrictions on rates and forms in the same fashion as admitted insurers.

■ The trial court properly determined that the "Condition: Excludes Assault & Battery" term contained in the binder did not exclude coverage for claims asserted in the Wegers' lawsuit. As an initial matter, the trial court correctly refused to expressly incorporate the Endorsement into the binder because the binder did not contain express language subjecting it to the language in the policy. Moreover, the binder itself was not silent; it specified a term referencing a limit on assault and battery coverage. However, even assuming it was proper to consider the later-issued policy in an effort to supply meaning to the "sketchy" binder term, "Condition: Excludes Assault & Battery," the trial court properly refused, under the circumstances of this case; to use the language in the Endorsement as a guide to the intended coverage.

The trial court heard extensive testimony on forms used both by Alea London and the surplus lines industry. The trial court made a specific finding that the Alea London expert who testified that the relevant language in the Endorsement was typical was not credible. We are required to defer to the trial court's credibility findings. *See Brawley v. McNary*, 811 S.W.2d 362, 365 (Mo. banc 1991). Moreover, the record contains evidence that the Endorsement was not mainstream and was "draconian." Given the trial court's refusal to credit testimony describing the Endorsement as "typical" or "usual," there was no basis to incorporate the Endorsement into the binder. *Pape* 738 S.W.2d at 886. *See also, Hilt Truck Lines*, 756 F.2d at 678–79 (where insurer failed to adduce evidence that exclusion in policy was "usual" for industry, the court properly refused to include the exclusion in the binder).

■ Having determined that the trial court properly refused to incorporate the Endorsement into the binder, we consider whether the trial court erred when it construed the binder term "Condition: Excludes Assault & Battery" as ambiguous. In general, where the language of an insurance policy is ambiguous, it must be construed against the insurer. *Gulf Ins. Co. v. Noble Broadcast*, 936 S.W.2d 810, 814 (Mo. banc 1997). Moreover, "[p]rovisions restricting coverage are particularly construed most strongly against the insurer." *Meyer Jewelry Co. v. General Ins. Co. of Am.*, 422 S.W.2d 617, 623 (Mo.1968). As we have recently reiterated, "an ambiguity exists when there is duplicity, indistinctiveness or uncertainty in the meaning of the language used in the policy. Language is ambiguous if it is reasonably open to different constructions." *State Farm Mut. Auto. Ins. Co. v. Esswein*, 43 S.W.3d 833, 840–41 (Mo.App. E.D.2003). With respect to the construction of binders in particular, a binder which is ambiguous should be construed in favor of the insured. *Couch on Insurance* 3d Section 13:6; *Turner v. Worth Ins. Co.*, 106 Ariz. 132, 472 P.2d 1, 3 (1970). Moreover, even in circumstances, unlike here, where a standard policy term is incorporated into the binder, if "the terms of a binder conflict with the terms of the standard policy, an ambiguity arises, and the binder and policy will be construed together, with the most liberal provision, in favor of the insured, controlling." *Pine Ridge Realty*, 752 A.2d at 599.

■ Both parties adduced evidence at trial regarding the meaning of the term "Condition: Excludes Assault & Battery." Assuming that the term expresses an intent to exclude assault and battery from coverage,[9] the record establishes that the

---

9. Laclede Street and the Wegers argue that use of the term "Condition" is itself confusing

and creates an ambiguity because the term "condition" used in an insurance context, de-

surplus lines industry employed at least two exclusions which potentially exclude coverage for assault and battery. The first type of exclusion excludes coverage for acts expected or intended from the standpoint of the insured. This would typically exclude acts of the insured's employees, rather than patrons. Indeed, this type of exclusion is found in the body of the policy issued to Laclede Street. The second type of exclusion is much broader and excludes liability from injuries expected or intended by the insured as well as injuries arising from assault and battery regardless of who committed the act or whether expected or intended by the insured. This exclusion was found in the Endorsement which was attached to the policy and deleted and replaced the less restrictive language found in the policy. The binder language is insufficient to indicate which version of an assault and battery exclusion applies.[10] Because we construe ambiguous terms against the insurer, we conclude that the binder term does not preclude coverage for the claims asserted by the Wegers.

scribes an act necessary to obtain or preserve coverage and therefore has a different meaning than the term "exclusion." *See Empire Fire and Marine Ins. Co. v. Dust*, 932 S.W.2d 416, 418 (Mo.App. E.D.1996) ("an exclusion does not provide coverage, it only limits the obligation undertaken by the policy"). Alea London disagrees that the term "Condition," as used in the binder, is ambiguous but nevertheless points us to Webster's dictionary to resolve the issue. The record, however, supports Laclede Street's contention that "condition" is a term referring to an action an insured must take to preserve its rights to coverage under a policy. In any event, we do not agree that the use of the word "Condition" in conjunction with the phrase "Excludes Assault & Battery" is alone sufficient to create any ambiguity.

10. According to *Holmes' Appleman on Insurance 2d*, assault and battery exclusions are

In arguing that the binder term is not ambiguous, Alea London focuses on the meaning of the words "assault and battery" as used in the binder and in the Endorsement. In particular, Alea London relies on several cases involving summary judgments appealed after a trial court construed an "assault and battery" exclusion used by Capital Indemnity insurance company. *See Capitol Indem. Corp. v. Callis*, 963 S.W.2d 247 (Mo.App. W.D.1997). In the Capital Indemnity cases, courts construed a very detailed assault and battery exclusion that contained its own set of definitions. In contrast here, neither the Endorsement nor the binder contained similar language.

Alea London also points to *Peck v. Alliance Gen. Ins. Co.*, 998 S.W.2d 71 (Mo. App. E.D.1999) as support for the proposition that all assault and battery exclusions reach negligence claims. We do not read *Peck* as determining this question. Nor do we decide the question here. Suffice it to say that, depending on the particular language used in an assault and battery exclusion, some policies may exclude coverage for negligence claims and some may

"[o]ne of the most frequently litigated subjects in liability insurance law ... The litigation typically concerns not only the interpretation and construction of the assault and battery exclusion but also the exclusion's validity, its applicability to persons or entities covered by the exclusion, and its applicability to the discrete conduct at issue." 21 *Holmes' Appleman on Insurance 2d* Section 133.1, p. 198. While broadly worded assault and battery exclusions may well exclude the type of claims asserted by the Wegers, more narrowly worded exclusions may not. There is particular disagreement over whether assault and battery exclusions cover acts committed by patrons, rather than insured employees and whether, depending on the particular policy language at issue, negligence claims are excluded. *See Validity, Construction, and Effect of Assault and Battery Exclusion in Liability Insurance Policy at Issue*, 44 A.L.R.5th 91.

not, hence, the ambiguity created here regarding the meaning of the binder term.

### 2. Does the liquor liability exclusion in the policy exclude coverage for the claims asserted in the Wegers' lawsuit?

Alea London contends that because the Wegers' claims arose out of Laclede Street's negligence in serving alcohol to Mr. Metzger, the liquor liability exclusion contained in the January 16 policy excludes coverage. There is no question that the binder neither expressly referenced liquor liability coverage nor employed language subjecting the binder to terms in the policy. However, Alea London argues that because the liquor liability exclusion was part of the policy, the trial court erred in refusing, as a matter of law, to incorporate it into the binder.

■■■ As we have discussed above, to warrant incorporation into the binder, there must be evidence adduced at trial that the policy term at issue is a standard or typical term. See Pape, 738 S.W.2d at 886. While we disagree with Laclede Street and the Wegers' declaration that Pape can never be applicable to a surplus lines binder, we conclude that where, as here, the record lacks sufficient credible proof that the term sought to be incorporated is standard or typical, it is not proper to incorporate a policy term into a binder.[11]

■■■ Because we conclude that incorporating the liquor liability exclusion into the binder is not appropriate in the absence of evidence that the specific exclusion asserted here is typical or standard in the surplus lines industry, we do not need to reach Alea London's argument that the liquor liability exclusion covers Laclede Street even though Alea London classified Laclede Street as a restaurant not serving alcohol in the policy. However, we do note that the unambiguous language of the policy provided that the liquor liability exclusion applied only to insureds in the "business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages." Furthermore, the policy expressly described Laclede Street as a restaurant on its common declarations page and further classified Laclede Street on its "coverage part declarations" page as "restaurants—with no sale of alcoholic beverages—without dance floor." If we construe this language as unambiguous, as Alea London urges, and incorporate the exclusion into the binder, the rules of construction are inapplicable and we must enforce the policy as written. Mansion Hills Condominium Ass'n. v. American Family Mut. Ins. Co., 62 S.W.3d 633, 637 (Mo.App. E.D.2001). Furthermore, where there is no ambiguity, extrinsic evidence is inadmissible to determine the intent of the parties. Daniels Exp. and Transfer Co. v. GMI Corp., 897 S.W.2d 90, 92 (Mo.App. E.D.2003). Because the exclusion, as written and construed, with reference to the policy as a whole, does not exclude coverage of "liquor liability" claims against insureds who do not sell alcohol, as Alea London classified Laclede Street, Alea London cannot rely on the exclusion to deny coverage.

■■■ Although Alea London acknowledges the problem caused by its clas-

11. In its reply brief, Alea London states: "This liquor liability exclusion was part of the standard commercial general liability policy form customarily used by Alea London and additionally used throughout the industry." However, Alea London provides us with no citation to the record for this statement and our own review does not reveal any testimony to this effect. This belated acknowledgement of the significance of such a factual finding is an insufficient basis for a finding that the liquor liability exclusion was standard or typical.

sification of Laclede Street as a restaurant (and attempts to redress the problem through reformation of the policy), it argues that the policy should be interpreted to exclude coverage because Laclede Street "had no reasonable expectation that the insurance contract between Alea London and Laclede would provide coverage for Liquor Liability." The "reasonable expectation rule of construction" provides that "the objective reasonable expectations of adherents and beneficiaries to insurance contracts will be honored even though a thorough study of policy provisions would have negated these expectations." *Robin v. Blue Cross Hosp. Service, Inc.*, 637 S.W.2d 695, 697 (Mo. banc 1982). However, as Alea London concedes, citing *Shelter Mut. Ins. Co. v. Flint*, 837 S.W.2d 524, 529 (Mo.App. W.D.1992), the reasonable expectations rule cannot be used to construe unambiguous policy terms. Thus, whether Laclede Street expected liquor liability coverage is not a relevant consideration here.

## B. *Reformation*

In its final point on appeal, Alea London contends that the trial court erred in denying Alea London's request to reform the policy it issued thirteen days after Mr. Weger's death. The trial court refused to reform the policy on several grounds: (1) no proof of fraud or material mistake; (2) estoppel; and (3) the binder did not include a liquor liability exclusion and therefore reformation is a "useless academic exercise."

Because we have concluded that Alea London failed to adduce evidence that the liquor liability exclusion was a standard or typical term, thus precluding its incorporation into the binder, reformation of the policy would not result in the exclusion of liquor liability coverage. Thus, we do not

need to reach the propriety of the trial court's analysis and conclusions.

However, even if we were to consider whether the trial court erred in refusing to reform the policy, we would affirm the trial court's determination. As an initial matter, it is well-settled that reformation of a contract is an extraordinary equitable remedy and should be granted with great caution and only in clear cases of fraud or mistake. *Elton v. Davis*, 123 S.W.3d 205, 212 (Mo.App. W.D. 2003). As our Supreme Court has held, an entitlement to reformation must be shown by "clear, cogent, convincing evidence, beyond a preponderance of the evidence and so as to leave no room for reasonable doubt...." *American Family Mut. Ins. Co. v. Bach*, 471 S.W.2d 474, 477 (Mo. 1971).

Alea London contends that its classification of Laclede Street as a restaurant not serving alcohol reflects a mutual mistake. Alea London concedes, however, that, prior to the issuance of the policy, Laclede Street conveyed to Alea London information from which Alea London could conclude that Laclede Street served alcohol. As defined in *Williston on Contracts 4th ed.* "[a] mutual mistake occurs when both parties, at the time of contracting, share a misconception about a basic assumption or vital fact upon which they based their bargain." 27 *Williston on Contracts, 4th ed.*, Section 70:107, p. 536. Moreover, "[w]hether parties are laboring under a mutual mistake is normally a question of fact." *Id.* at Section 70:904, p. 503. Here, there was no proof adduced that either party shared a mistaken assumption upon which the contract was based.

By contrast, a unilateral mistake is a mistake on the part of only one of the parties and is generally not an adequate

basis for reformation. *Kopff v. Economy Radiator Service*, 838 S.W.2d 449, 452 (Mo.App. E.D.1992). There is no dispute that Alea London drafted the policy and classified Laclede Street as a restaurant which did not serve alcohol, despite receiving accurate information regarding the nature of Laclede Street's business. Moreover, when Laclede Street became aware of the classification in September 2002 receiving and after reading, for the first time, the Alea London policy, it communicated the inaccuracy. Nevertheless, Alea London failed to modify the policy to reflect what it now seeks. Indeed, Alea London filed suit based on the policy and only sought to reform the policy after the trial court denied summary judgment.

"The law permits reformation of instruments to reflect the true intention of the parties when the error has arisen by the unilateral mistake of one party and that mistake is accompanied by clear and convincing evidence of some sort of fraud, deception or other bad faith activities by the other party that prevented or hindered the mistaken party in the timely discovery of the mistake." 27 *Williston on Contracts 4th ed.*, Section 70:104, p. 520. *See also, Jenkad Enterprises, Inc. v. Transportation Insurance Co.*, 18 S.W.3d 34, 39 (Mo.App. E.D.2000) (reformation on the ground of mutual mistake not appropriate where insured failed to timely examine the policy even though both insurer and insured knew policy did not reflect the insurance coverage bound for); *EBSCO Industries, Inc. v. Royal Ins. Co.*, 775 So.2d 128, 131 (Ala.2000) (where insurer failed to remove insured from policy despite mutual agreement that insured would no longer be covered, mistake was unilateral and insufficient to support reformation). Here, Alea London adduced absolutely no evidence, let alone clear and convincing evidence, that Laclede Street acted in bad faith, committed fraud or deceived Alea London. Moreover, Laclede Street did nothing to hinder Alea London in the discovery of its error. It is well settled that "[e]quity will not relieve against mistake when the complaining party had within his reach the true state of facts, and, without being induced by the other party, neglected to avail himself of his opportunities of information." *Croy v. Zalma Reorganized School Dist. R–V*, 434 S.W.2d 517, 522 (Mo.1968). Point denied.

### Conclusion

The judgment of the trial court is affirmed.

MARY K. HOFF, P.J., and CLIFFORD H. AHRENS, J., Concur.