Paul ULLRICH, Plaintiff/Appellant,

v.

CADCO, INC., d/b/a Imperial Homes, Inc., Bankers National Inc.—A Lender Company, and Cort Anthony Dietz, Defendants/Respondents.

No. ED 89395.

Missouri Court of Appeals, Eastern District, Division Four.

Jan. 29, 2008.

Daniel R. Schramm, LLC, Daniel R. Schramm, Chesterfield, MO, for appellant.

Cunningham Rayfield, P.C., Joseph P. Cunningham, III, Crystal City, MO, for respondent.

*OPINION*

MARY K. HOFF, Presiding Judge.

Paul Ullrich (Ullrich) appeals from the trial court's judgment entered after a non-jury trial on Ullrich's Fourth Amended Petition against CADCO, Inc., and Bankers National, Inc., doing business as Imperial Homes, Inc., and Cort Dietz (Dietz) (collectively referred to as CADCO), alleging that CADCO had committed breach of contract and fraud and had violated the Missouri Merchandising Practices Act (MMPA), Chapter 407 RSMo, et seq.[1] The trial court's judgment is affirmed in part and reversed and remanded in part.

*Factual and Procedural History*

CADCO was a collection of Missouri corporations dealing in the sales and financing of mobile homes and modular homes. In February 1999, Ullrich went to CADCO's retail location and spoke with a sales representative, who showed Ullrich several modular homes. Ullrich decided to purchase a particular model and signed a contract. However, after returning home and thinking over his purchase, Ullrich cancelled the contract.

When Ullrich informed CADCO of his decision, explaining he did not have the time or the knowledge to find or purchase land, to construct the basement foundation on which the modular home would be placed, or to install a well and septic system, the sales representative replied that CADCO would act as a general contractor and would "take care of everything." The sales representative said that it was common for CADCO to assist its customers with finding land, installing wells and septic systems, and constructing foundations and driveways for their homes. The sales representative said that CADCO would provide the same type of assistance to

---

1. All statutory references are to RSMo 1994, unless otherwise indicated.

Ullrich, including financing, so that Ullrich would be purchasing a "turn key package." CADCO's finance manager and the sales representative also informed Ullrich that CADCO would be able to help Ullrich obtain financing at an interest rate better than a bank's rate.

Consequently, Ullrich agreed to purchase the modular home from CADCO for a total price of $45,926.11, which included taxes, title fees, insurance, and delivery fees. Ullrich and CADCO entered into a written form contract that specifically required CADCO to deliver and set up the modular home on Ullrich's site, to install central air conditioning, and to connect the modular home to water and sewer lines. Although the contract did not contain any provision indicating that CADCO was acting as general contractor or recite what CADCO's duties as general contractor would entail, Ullrich and CADCO orally agreed that CADCO would carry out the site improvements necessary for the modular home, including the construction of a basement, the installation of a well and septic system, and electrical service. Ullrich paid a total of $2,000 in down payments prior to closing.

In March 1999, Ullrich entered into a contract with Frank and Carol Linnaman (the Linnamans) for the sale of a tract of land known as Lot 2 of Linnaman Acres (Lot 2), intending to have CADCO deliver and install the modular home there. Ullrich agreed to purchase Lot 2 for $11,900 and paid $500 earnest money toward the purchase.

On June 10, 1999, Ullrich closed the sales of both the modular home and Lot 2. Ullrich first paid CADCO $11,026 as an additional down payment for the modular home. Ullrich and CADCO then entered into a written Construction Loan Agreement designating CADCO as general contractor for the site improvements to Lot 2.

Ullrich thereafter executed a note and deed of trust in favor of IndyMac Mortgage Holdings, Inc., (IndyMac) in return for a loan in the amount of $87,952.51 to pay the balance of the purchase price for the modular home, the balance of the purchase price for Lot 2, and to pay CADCO an estimated $30,168.02 for the site improvements to Lot 2. CADCO informed Ullrich that $10,000 was "built in" to the construction estimate to cover any unforeseen problems with the site improvements, such as blasting for the basement. CADCO assured Ullrich that he would be living in his modular home by July 4, 1999.

On or about July 1, 1999, CADCO hired a subcontractor to work on the site improvements, but, after clearing the land, the subcontractor refused to return to the job. CADCO did not hire any other subcontractor to make the site improvements.

Ullrich and CADCO subsequently encountered a series of disagreements concerning the specifications of certain site improvements. According to CADCO, Ullrich requested greater amperage for his electrical service and higher basement walls than what CADCO had agreed it would provide. According to Ullrich, however, he and the sales representative had agreed prior to closing on a level of electrical service and a height for the basement walls that were acceptable to both parties and had been included in the deal. Ullrich also learned that there were no plans for the septic system even though CADCO had verbally indicated otherwise. Later, in October 1999, CADCO informed Ullrich that a soil percolation test on Lot 2 had revealed that an "unconventional" septic system was necessary, and he would need to pay an additional $8,000 to $9,000 because the cost of installing an "unconventional" septic system was not included in the Construction Loan Agreement. The soil percolation test had been performed in

April; thus, it appeared CADCO had known about the soil on Lot 2 and the need for the "unconventional" septic system prior to June the closing. Ullrich refused to pay CADCO any additional monies because he believed the $10,000 "built in" to the contract should have covered the added expense.

In January 2000, Ullrich met with representatives of CADCO in an attempt to resolve the parties' disputes, but they did not reach an agreement. Ullrich never received any billing statements from Indy-Mac or its successor on the deed of trust, Oakwood Acceptance Corporation (Oakwood). However, Oakwood sent Ullrich a letter demanding payment of the entire loan balance, $87,952.51. Although Ullrich denied owing the amount demanded because he never received the modular home or the site improvements financed through the loan, Lot 2 remained encumbered by the deed of trust secured by the loan held by Oakwood.

In November 2000, Ullrich encouraged his friend, William C. Jackson (Jackson), to go to CADCO's retail location. While there, Jackson did not reveal that he and Ullrich were friends. Jackson expressed interest in purchasing Ullrich's modular home, which was still located there. Jackson toured the modular home and photographed a futon and stove Ullrich had purchased in anticipation of moving into the modular home and had stored there. The sales representative assisting Jackson stated that the futon and stove were included with the modular home. Jackson and CADCO signed a contract for the modular home, but Jackson cancelled the contract a few days later. The futon and stove, which had a combined cost of $1,300, were never returned to Ullrich.[2]

On November 7, 2000, Ullrich filed a petition alleging that CADCO had failed to perform its duties under the contract and the Construction Loan Agreement and requesting specific performance of those duties and punitive damages. Over the next four years, Ullrich filed three amended petitions in which he dropped the request for specific performance but continued to allege breach of contract and additional claims and to seek actual and punitive damages. On February 1, 2005, Ullrich filed his Fourth Amended Petition, which contained six counts: Count I alleged breach of contract; Count II alleged punitive damages related to Count I; Count III alleged common law fraud; Count IV alleged punitive damages related to Count III; Count V alleged that CADCO violated the MMPA, Section 407.020, by engaging in unlawful practices as defined by the MMPA; and Count VI alleged that Dietz, as president, sole director, registered agent, and sole stockholder of CADCO, exercised a sufficient degree of control over CADCO to allow the trial court to pierce the corporate veil and to hold Dietz personally liable for Ullrich's damages.

CADCO filed its answer to the Fourth Amended Petition denying Ullrich's claims along with a counterclaim against Ullrich and Jackson and a motion requesting to join Jackson as a third-party defendant, which the trial court granted. CADCO's counterclaim alleged that Ullrich and Jackson had conspired to induce CADCO to contract with Jackson for the sale of the modular home for the sole purpose of using evidence of the sale to build Ullrich's case in his lawsuit against CADCO.

---

**2.** The record reveals that CADCO eventually sold Ullrich's modular home to another individual for $29,900 during the litigation of the instant case. CADCO did not return any of Ullrich's down payments totaling $13,026.

After a two-day non-jury trial, the trial court took the matter under submission. The trial court later issued findings of fact and conclusions of law and entered its judgment in favor of Ullrich on Count I, awarding him compensatory damages of $15,686.50 for amounts Ullrich had paid to CADCO toward the purchase price of the modular home, including the down payments of $13,026, insurance premiums of $1,538, and the title fee of $13.50. The trial court found in favor of CADCO on Counts II, III, IV, and V and in favor of Dietz on Count VI. The trial court further found that CADCO did not sustain any damages with regard to its counterclaim against Ullrich and Jackson and, therefore, entered judgment in favor of Jackson. This appeal follows.

### Standard of Review

We review the trial court's judgment in a non-jury case under the rule announced in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Alea London Ltd. v. Bono–Soltysiak Enterprises*, 186 S.W.3d 403, 409 (Mo.App. E.D.2006). We defer to the trial court's findings of fact, giving due regard to the trial court's determinations of the credibility of witnesses. *Id.* We review the evidence and reasonable inferences drawn therefrom in the light most favorable to the judgment, disregarding evidence and inferences to the contrary. *Id.* However, we review questions of law *de novo. Id.*

### Claims Involving the Missouri Merchandising Practices Act

In his first, second, and third points on appeal, Ullrich argues the trial court erred in entering judgment against him on his claims made under the MMPA because the rulings were contrary to law, were not supported by substantial evidence, and were against the weight of the evidence.

■ In his first point, Ullrich argues the trial court misapplied Rule 55.15 in determining that Ullrich had failed to plead violations of the MMPA with the same particularity as common law fraud and requests a remand to the trial court for reconsideration of his MMPA claim. We agree.

■ Although Rule 55.15 requires that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," a claim alleging violations of the MMPA does not necessarily need to be stated with the same particularity as a claim of common law fraud or mistake. The MMPA provides, in pertinent part:

The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... is declared to be an unlawful practice.

Section 407.020.1. The MMPA grants an individual "who purchases or leases merchandise ... and thereby suffers an ascertainable loss of money or property" the right to pursue a private cause of action based on a MMPA-prohibited act. Section 407.025.1. The purpose of the MMPA is "to preserve fundamental honesty, fair play and right dealings in public transactions." *Schuchmann v. Air Services Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 233 (Mo.App. S.D.2006) (internal quotations omitted). "[T]he MMPA supplements the definition of common law fraud, eliminating the need to prove an intent to

defraud or reliance." *Id.* "The statute and the regulation paint in broad strokes to prevent evasion thereof due to overly meticulous definitions." *Id.*

In its judgment, the trial court stated that "[a]llegations of fraud must be strictly pleaded." Consequently, the trial court found that Count V of Ullrich's Fourth Amended Petition failed to describe any particular statement made by CADCO misrepresenting its qualifications to act as general contractor; thus, the trial court reasoned, Count V failed to properly allege a violation of the MMPA.

Based on our reading of the record and the applicable case law, however, we believe Ullrich adequately pleaded his cause of action. The record reveals that Count V of the Fourth Amended Petition incorporated the allegations set out in the preceding counts, which included detailed descriptions of the circumstances leading up to the filing of the lawsuit. Count V alleged that CADCO "engaged in unlawful practices as defined in Section 407.020 RSMo by misrepresenting their qualifications to act as general contractors in the aforementioned contract ... by failing to deliver the modular home to the construction site and erecting it; by failing to remain within the budget for the construction process; and by failing to perform the terms of the contract as originally agreed to by the parties." It was not necessary for Ullrich to allege the elements of common law fraud or that CADCO intended to defraud him by misrepresenting its qualifications to act as general contractor or that Ullrich relied on CADCO's misrepresentations as the basis for entering into the contract in order to adequately plead his cause of action under the MMPA. *See Schuchmann,* 199 S.W.3d at 232. Accord-

ingly, the trial court misapplied Rule 55.15. Point one is granted.

In his second point, Ullrich argues the trial court erred in concluding that Ullrich's MMPA claim, alleged for the first time in Count V of his Fourth Amended Petition, was time barred by the five-year general statute of limitation, Section 516.120, because the MMPA claim should have related back to Ullrich's previous pleadings.[3]

Under the relation-back doctrine, if a claim "asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." *Craig v. Missouri Dept. of Health,* 80 S.W.3d 457, 461 (Mo. banc 2002); Rule 55.33(c). A claim alleging a violation of the MMPA based on a contract must be filed within five years from the time the plaintiff discovers he sustained damage as a result of the violation. Section 516.120; *Schuchmann,* 199 S.W.3d at 237–38.

In the judgment, the trial court found that Ullrich's Fourth Amended Petition containing the MMPA claim was filed more than five years after his original cause of action for breach of contract had accrued on June 10, 1999, which was the closing date for Ullrich's purchase of the modular home. The trial court therefore found that the MMPA claim was time barred. In its brief, CADCO concedes the trial court should have allowed the MMPA claim to relate back "to at least" Ullrich's preceding petition, which was filed within five years of June 10, 1999, but contends the error did not materially affect the merits of the case in light of the trial court's

3. The *MMPA*, Chapter 407 RSMo, et seq., does not provide a special limitation on actions brought under its sections; thus, the general statute of limitations, Section 516.120, applies.

conclusion that Ullrich's MMPA claim was insufficiently pleaded. However, because we have already determined that Ullrich's pleading sufficiently stated his MMPA claim, the relation-back rule should have applied, and the trial court erred in finding the MMPA claim was time barred. Point two is granted.

In his third point, Ullrich specifically argues the trial court abused its discretion in rejecting his claim for his attorneys' fees because such a claim is allowed under the MMPA and was supported by sufficient evidence. The record indicates that Ullrich testified that he had incurred $27,500 in attorneys' fees, but the trial court found that this evidence was insufficient to establish the reasonableness of the fees. The trial court also found that Ullrich could not be awarded attorneys' fees based on the MMPA claim because he was not the prevailing party on that claim, a finding that was based on an accurate reading of Section 407.025.1, which allows the trial court to award reasonable attorneys' fees to the prevailing party in an MMPA action. However, given our rulings on Ullrich's first and second points reversing the trial court's judgment and remanding for further proceedings on Ullrich's MMPA claim, the trial court may reconsider Ullrich's request for attorneys' fees related to that MMPA claim. Point three is granted.

*The Claim for Consequential Damages*

In his fourth point, Ullrich argues the trial court erred in limiting his damages award to $15,686.50 because he also sustained consequential damages, which were recoverable under either a claim for breach of contract or for a violation of the MMPA. We agree.

Consequential damages are those damages naturally and proximately caused by the commission of the breach and those damages that reasonably could have been contemplated by the defendant at the time of the parties' agreement. *St. John's Bank & Trust Co. v. Intag, Inc.*, 938 S.W.2d 627, 629 (Mo.App. E.D.1997). The party claiming damages for breach of contract bears the burden of proving the existence and amount of the damages with reasonable certainty. *Delgado v. Mitchell*, 55 S.W.3d 508, 512 (Mo.App. S.D.2001). Missouri courts have recognized that claims of breach of contract, fraud, and violations of the MMPA are not inconsistent legal theories of recovery and do not involve inconsistent remedies; thus, a plaintiff asserting all of those claims is not required to make an election of remedies and may recover consequential damages in addition to actual damages and benefit-of-the bargain damages. *Trimble v. Pracna*, 167 S.W.3d 706, 711 (Mo. banc 2005); *Davis v. Cleary Building Corp.*, 143 S.W.3d 659, 669 (Mo.App. W.D.2004). However, if the damages for all of those claims are the same, the damages award merges. *Davis*, 143 S.W.3d at 670.

Here, Ullrich made an offer of proof concerning his alleged consequential damages, which the trial court denied. Because of our rulings reversing the trial court's judgment on Ullrich's MMPA claim, the trial court may reconsider Ullrich's claims for consequential damages on remand.[4] Point four is granted.

*Claims Involving the Admission or Exclusion of Evidence*

In his fifth and sixth points on appeal, Ullrich challenges the trial court's rulings

4. This Court makes no determination as to the validity of Ullrich's alleged consequential damages.

with regard to the admission or exclusion of certain evidence.

■ The trial court enjoys considerable discretion in ruling on the admission or exclusion of evidence; thus, we will not reverse the trial court's ruling excluding evidence unless the ruling constituted an abuse of that discretion. *Biermann v. Gus Shaffar Ford, Inc.*, 805 S.W.2d 314, 325 (Mo.App. S.D.1991).

■ In his fifth point, Ullrich argues the trial court abused its discretion in admitting evidence of settlement proposals presented to him by CADCO prior to the litigation. We disagree.

■ Generally, evidence of settlement offers is inadmissible because of the public policy favoring the settlement of disputes. *J.A. Tobin Const. Co. v. State Highway Com'n of Missouri*, 697 S.W.2d 183, 186 (Mo.App. W.D.1985). Either the offeror or the offeree may invoke the rule. *Chase Third Century Leasing Co., Inc., v. Williams*, 782 S.W.2d 408, 412 (Mo.App. W.D.1989); *Vinyard v. Herman*, 578 S.W.2d 938, 942 (Mo.App. S.D.1979). However, if an offer of settlement also constitutes an admission of an independent fact relevant to an issue between the parties, the offer of settlement will be deemed admissible on that issue. *Tobin*, 697 S.W.2d at 187.

Here, Ullrich's claim is without merit because the letter was relevant to the issue of whether CADCO had intended to perform its obligations under the parties' original agreement at the time they entered into that agreement. On direct examination, Dietz testified that Ullrich wanted a level of electrical service and a height for the basement walls that were different from and more expensive than the electrical service and basement walls contemplated by the terms of the parties' original agreement. Dietz further testified

that, in January 2000, Ullrich sent him a letter directing him to contact Ullrich through Ullrich's attorney. Dietz subsequently met with Ullrich at Ullrich's attorney's office "to come to a final and complete understanding of what [Ullrich] was expecting us to perform." After the meeting, Dietz sent Ullrich a letter outlining four alternative methods of resolving their dispute. CADCO's attorney introduced the letter into evidence, but Ullrich objected on the ground the letter was inadmissible as an offer of settlement. The trial court ruled the letter was admissible because it was relevant, "at least on the [issue of] punitive [damages]," of whether CADCO ever intended to perform the parties' original agreement from the start. On the record before us, we agree with the trial court's ruling.

Furthermore, we note that, after he objected to the admission of the letter, Ullrich proceeded to conduct a lengthy and detailed cross-examination of Dietz about the letter and its contents. Thus, Ullrich affirmatively waived any error in the admission of the letter. *See Banks v. Village Enterprises, Inc.*, 32 S.W.3d 780, 797 (Mo. App. W.D.2000). Point five is denied.

■ In his sixth point, Ullrich argues the trial court abused its discretion in refusing to admit proposed evidence of a prior judgment levied against CADCO to show CADCO's fraudulent intent with regard to its dealings with Ullrich. We disagree.

■ Generally, evidence of transactions not connected with those involved in the instant case is not admissible. *Brockman v. Regency Financial Corp.*, 124 S.W.3d 43, 51 (Mo.App. W.D.2004). However, when a defendant's intent or mental culpability must be proven, such as in cases of fraud, the defendant's actions toward others tending to demonstrate the

intent with which the defendant may have acted in the instant case become relevant. *Id.* 124 S.W.3d at 51. Consequently, Missouri courts have held that evidence of a defendant's other acts is admissible if those acts are sufficiently connected to the wrongful acts at issue so that evidence of the other acts may tend to show the defendant's disposition, intent, or motive in the commission of the acts in the instant case. *Id., citing Boyer v. Grandview Manor Care Center,* 759 S.W.2d 230, 234 (Mo.App. W.D.1988).

Here, during his direct examination of Dietz, Ullrich introduced Plaintiff's Exhibit 44, which was the certified court record of a previous lawsuit in which an individual not related to or connected with Ullrich alleged CADCO had committed fraud and fraudulent misrepresentation. Upon CADCO's objection, the trial court allowed Ullrich to make an offer of proof concerning his exhibit:

> [Ullrich]: The allegations [in the previous lawsuit] were such that fraud had been committed by [CADCO] at that time as stated in their allegations; is that right?
>
> [Dietz]: Correct.
>
> [Ullrich]: Did the jury return a verdict?
>
> [Deitz]: Yes.
>
> [Ullrich]: How much did the jury return a verdict for?
>
> . . .
>
> $84,000.00, was it not?
>
> [Dietz]: Yes.
>
> [Ullrich]: Based on the offer of proof, I'm going to offer the certified copy of the official record of the [previous lawsuit], marked as Plaintiff's Exhibit 44, and ask the Court to take judicial notice of it, and close my offer of proof.
>
> [CADCO's attorney]: We renew our objection as being irrelevant and immaterial to any facts alleged in this case, move

that it be denied, and that the offered evidence be refused.

> THE COURT: The offer of proof is denied. The Exhibit 44 may be a portion of the record for any appellate purposes. It is not received into evidence, obviously.

As the record reveals, Ullrich's offer of proof made no connection between the facts underlying the allegations of fraud in the previous lawsuit and the facts underlying Ullrich's allegations of fraud in the instant case. Accordingly, the trial court did not abuse its discretion in refusing to admit the proposed evidence. Point six is denied.

### Conclusion

In accordance with our findings under Points I, II, III, IV, we reverse the trial court's judgment with regard to Ullrich's claims involving the MMPA, possible consequential damages, and attorneys' fees and remand for further proceedings. In all other respects, we affirm the judgment of trial court.

SHERRI B. SULLIVAN, Judge and GEORGE W. DRAPER III, Judge, Concur.