985 So.2d 1036 (2008)
ESSEX INSURANCE COMPANY, Appellant,
v.
Mercedes ZOTA, et al., Appellees.
No. SC06-2031.
Supreme Court of Florida.
June 26, 2008.
*1038 Douglas M. McIntosh and Robert C. Weill of McIntosh, Sawran, Peltz and Cartaya, P.A., Fort Lauderdale, FL, for Appellant.
Matthew D. Weissing of Rothstein Rosenfeldt Adler, Fort Lauderdale, FL, and Mara Shlackman of The Law Offices of Mara Shlackman, P.L., Fort Lauderdale, FL; and Michael D. Kaplan of Zebersky and Payne, LLP, Hollywood, FL, for Appellees.
L. Michael Billmeier, Jr., and Clyde W. Galloway, Jr. of Galloway, Brennan and Billmeier, Tallahassee, FL, on behalf of The Florida Surplus Lines Service Office; John R. Catizone of Litchfield Cavo, LLP, Tampa, FL, on behalf of Property Casualty Insurers Association of America; Anthony J. Russo and William R. Lewis of Butler, Pappas, Weihmuller, Katz, Craig, LLP, Tampa, FL, on behalf of Landmark American Insurance Company, Axis Surplus Insurance Company, and Arch Specialty Insurance Company; Roy D. Wasson of Wasson and Associates, Chartered, Miami, FL, on behalf of Florida Justice Association; and Daniel S. Green of Ullman, Bursa, Hoffman and Ragano, LLC, Tampa, FL, and Tracy Raffles Gunn of Fowler, White, Boggs and Banker, P.A., Tampa, FL, for Amici Curiae.
*1039 LEWIS, C.J.
This case is before the Court for review of several questions of Florida law certified by the United States Court of Appeals for the Eleventh Circuit as determinative of a cause pending in that court and as unanswered by existing Florida precedent. See Essex Ins. Co. v. Zota, 466 F.3d 981, 990 (11th Cir.2006) ("Zota II"). We have jurisdiction pursuant to article V, section 3(b)(6) of the Florida Constitution, and for the reasons explained below, we find it proper to answer only one of the certified questions.
This case hinges upon seemingly age-old questions surrounding the proper contours of the agency relationship between an insured and a purported insurance broker questions for which our prior precedent provides useful guidance. However, below, the United States District Court for the Southern District of Florida ("the federal district court") appears to have based the entry of a summary judgment in favor of the Appellees upon an interpretation of sections 626.922 and 627.421, Florida Statutes (2003), that would alter our prior precedent in this area. See Essex Ins. Co. v. Zota, 18 Fla. L. Weekly Fed. D609, 2005 WL 2456860 (S.D.Fla. April 13, 2005), final summary judgment granted, 18 Fla. L. Weekly Fed. D611, 2005 WL 2456081 (S.D.Fla. June 2, 2005) (collectively "Zota I"). In particular, the federal district court appears to have held that these statutes have abrogated Florida's long-standing common-law agency rules by placing an affirmative duty upon a surplus-lines insurer or its direct surplus-lines agent to deliver a copy of a surplus-lines insurance policy directly to the insured, notwithstanding the successful delivery of the relevant policy to the representative of the insured, who was acting as an insurance broker in this particular transaction. See Zota I, 18 Fla. L. Weekly Fed. at D610.
As a result of the entry of the summary judgment, the federal district court did not examine or develop many of the factual issues implicated by the Eleventh Circuit's certified questions and, instead, simply estopped the surplus-lines insurer from relying on the language of the relevant policy exclusions. See id. at D610-11. For this reason, we find it unnecessary to answer all but one of the certified questions, as we agree with the maxim that "[t]he certification of a question of law does not place [a state supreme court] in a position to decide questions of fact." Brown Mach. Works & Supply Co. v. Ins. Co. of N. Am., 659 So.2d 51, 52 (Ala.1995).

I. BACKGROUND
The Eleventh Circuit has described in detail the existing facts of this case. For ease of explanation, we reproduce that description here with minor supplementation:
Mercedes Zota was injured [on February 5, 2004,] when she fell from scaffolding while painting a mural on the second story ceiling of a home under construction in Lighthouse Point, Florida ["the 30th Court property"]. Zota was performing work as a salaried employee of Perla Lichi Designs and the President of Trompe L'Oeils `R' Us when she was injured. Trompe L'Oeils and Perla Lichi Designs had contracted with Lighthouse Intracoastal, Inc., the owner of the premises where Zota was injured, to paint the ceiling of that residence.[[1]] After the incident, Zota and her husband, Miguel Zota, brought a negligence action [in Broward County Circuit Court] against: Lighthouse; Broward Executive Builders, Inc., the general contractor for the project; and Jack *1040 Farji, a fifty percent shareholder of Lighthouse and the owner of Broward. Lighthouse's insurer, the Essex Insurance Company, then filed [a federal diversity] action [on May 7, 2004,] seeking declaratory relief against Lighthouse, Broward, Farji, and the Zotas. It sought a determination and declaration of its rights and obligations with respect to the defendants in the [state-court] negligence action.
. . . Lighthouse, which is in the business of building "spec homes," secured various types of insurance to cover its activities as a homebuilder. Part of its insurance coverage is a surplus lines [commercial-general-liability] insurance policy ["CGL"] issued by MacDuff Underwriters, Inc. for Essex Insurance (Essex policy). MacDuff is the surplus lines agent for Essex. The surplus lines policy in question was delivered by MacDuff to R.A. Brandon & Company. Brandon is Lighthouse's producing agent, which means that it has undertaken to secure the various types of insurance that Lighthouse wanted.[[2]] When it secured insurance policies for Lighthouse, Brandon received copies of the policies, reviewed them for accuracy, and then provided them to Lighthouse. Brandon received a copy of the Essex policy, but Brandon, Essex and MacDuff all failed to provide a copy of it to Lighthouse.[3]
In the [federal] district court, both Essex and the defendants [i.e., the Zotas, Lighthouse, Broward Executive Builders, and Jack Farji] filed motions for summary judgment in th[e] declaratory action. Essex contended that the terms of Lighthouse's policy preclude coverage. The defendants contended that Essex had violated Florida Statutes §§ 626.922 and 627.421 by not delivering the policy to Lighthouse and, therefore, Essex was precluded from denying coverage. As a fallback position, the defendants contended that the Zota incident was covered under the policy anyway. The [federal] district court agreed with the defendants' first contention and granted their motion for summary judgment, declaring that Essex was precluded from denying coverage because it had failed to deliver the policy to the insured, as required by Florida Statutes *1041 §§ 626.922 and 627.421.[[4]]
The defendants subsequently filed a motion for attorney's fees under Florida Statute § 627.428. The district court granted that motion and entered a judgment for fees and costs against Essex and in favor of Lighthouse, Broward and Farji.[[5]] Essex has appealed both orders.
Zota II, 466 F.3d at 982-83 (emphasis supplied).
After probing the issues raised thus far in the Zota litigation, the Eleventh Circuit certified the following five questions to this Court:
1. Whether Fla. Stat. § 626.922 or § 627.421, or both, require delivery of evidence of insurance directly to the insured, so that delivery to the insured's agent is insufficient.
2. Whether, if the delivery requirement of Fla. Stat. § 626.922 or § 627.421, or both, was not met in this case the appropriate remedy is to preclude the insurer from asserting lack of coverage under the terms of the policy.
3. If either the first or second question is answered in the negative, whether Lighthouse is a "builder, contractor or developer" under the terms of the insurance contract, so that there is no coverage.
4. If either the first or second question is answered in the negative, whether Zota is an employee of Lighthouse under the policy.
5. If Lighthouse is entitled to coverage, whether Fla. Stat. § 627.428 applies to surplus lines insurers.
Id. at 990.

II. ANALYSIS
For the reasons explained below, we find it necessary and appropriate to solely address the first certified question. Further, our answer to that question obviates the need to address the second certified question and (in part) answers the fifth certified question. However, our analysis leads us to conclude that the third and fourth certified questions involve multiple undecided and underdeveloped factual questions. Therefore, we decline to address those questions in lieu of the federal district court. We conclude by answering the first certified question in the negative and, in the process, we hold that sections 626.922 and 627.421, Florida Statutes (2003), have not abrogated the common-law agency analysis that this Court has previously applied in insurance-broker cases.

A. The Scope of Section 627.021
A number of the issues presented in the Zota litigation involve provisions of chapter 627, Florida Statutes (2003). Essex, however, contends that by force of section 627.021(2)(e), chapter 627in its entiretydoes not apply in any way to surplus-lines insurance. See § 627.021(2)(e), Fla. Stat. (2003) ("This chapter does not apply to . . . [s]urplus lines insurance placed under the provisions of ss. 626.913-626.937." (emphasis supplied)). While it is understandable that Essex may advance a literal reading of this *1042 provision when taken in isolation, contrary to Essex's position, this Court has previously held thatunder a full statutory analysissection 627.021(2) applies exclusively to part I of chapter 627. See Nat'l Corporacion Venezolana, S.A. v. M/V Manaure V, 511 So.2d 968, 970-71 (Fla. 1987); §§ 627.011-627.381, Fla. Stat. (2003) (part I of chapter 627). Furthermore, the relevant legislative materials, as well as the structure and organization of chapter 627, demonstrate that the exclusionary provisions of section 627.021(2) only relate to "the ratings laws of part I, chapter 627, F.S.," as this Court has previously held. Fla. H.R. Comm. on Ins., CS for SB 368 & HB 1553 (1988) Staff Analysis 4 (final June 30, 1988) (available at Fla. State Archives, ser. 19, carton 1831, Tallahassee, Fla.) [hereinafter ch. 88-166 Staff Analysis] (emphasis supplied); see Manaure V, 511 So.2d at 970-71; see generally ch. 627, Fla. Stat. (2003).
In National Corporacion Venezolana, S.A. v. M/V Manaure V, this Court addressed the question of whether section 627.021(2)(c), Florida Statutes (1983), excluded marine insurance from section 627.7262,[6] which is the section that generally provides that a third party must obtain a judgment against an insured-tortfeasor before filing a direct action against an insurer. See 511 So.2d 968, 969 (Fla. 1987). Section 627.021(2) appears in part I of chapter 627, whereas section 627.7262 appears in part XI of chapter 627. See id. at 969-71. We held in Manaure V that while section 627.021(2) uses the language "[t]his chapter does not apply to," the Legislature actually intended for the word "chapter" to refer to "Chapter 16 `Rates and Rating Organizations.'" Id. (emphasis supplied). However, when the Statutory Revision Department prepared Florida's newly enacted Insurance Code for placement in the Florida Statutes, it renamed and renumbered "Chapter 16 `Rates and Rating Organizations,'" as "Part I `Rates and Rating Organizations.' " Id. (emphasis supplied). Thus, the Legislature only intended for the exclusionary provisions of section 627.021(2) to apply to "Part I `Rates and Rating Organizations,'" not chapter 627 as a whole. Id. (emphasis supplied). The Statutory Revision Department simply neglected to amend the word "chapter," referring to the original "Chapter 16 `Rates and Rating Organizations,'" to read "part," so that particular section would correctly refer to the renamed and renumbered "Part I `Rates and Rating Organizations.' " Id. (emphasis supplied).
In deciding Manaure V, this Court also stated that "if . . . from a view of the whole law, or from other laws in pari materia, the evident [legislative] intention is different from the literal import of the terms employed to express it in a particular part of the law, the intention should prevail, for that in fact, is the will of the Legislature." Id. at 970 (quoting Van Pelt v. Hilliard, 75 Fla. 792, 78 So. 693, 696 (1918)) (alteration in original). Likewise, in Curry v. Lehman, 55 Fla. 847, 47 So. 18 (1908), this Court stated:
We agree . . . that it is the duty of the court to interpret laws and not to make them, and we are to make no subtraction or addition to the meaning of a statute. The intention of the Legislature, however, in enacting a law, is the law itself, and must be enforced, when ascertained, although it may not be consistent with the strict letter of the statute. The court will not follow the letter of a statute when it leads away from the true intent and purposes of the Legislature and to *1043 conclusions inconsistent with the general purpose of the act.

Id. at 20 (emphasis supplied). Thus, pursuant to this Court's holding in Manaure V, where the Legislature clearly intended for the exclusionary provisions of section 627.021(2) to apply exclusively to part I of chapter 627, but the Statutory Revision Department erroneously failed to alter some of the relevant statutory language, this Court is bound to interpret section 627.021(2) consistent with the Legislature's true intent and inconsistent with the Statutory Revision Department's scrivener's error. See Manaure V, 511 So.2d at 969-71.
In 1988, the Legislature amended section 627.021 by adding another item to the exclusionary provisions that appear in subsection (2), which was the same statutory subsection that this Court examined in Manaure V. Specifically, the Legislature added "[s]urplus lines insurance." See ch. 88-166, § 2, Laws of Fla.; § 627.021(2)(d), Fla. Stat. (Supp.1988).[7] In this context, "the `legislature is presumed to know the judicial constructions of a law when enacting a new version of that law' and `the legislature is presumed to have adopted prior judicial constructions of a law unless a contrary intention is expressed in the new version.'" Jones v. ETS of New Orleans, Inc., 793 So.2d 912, 917 (Fla.2001) (quoting City of Hollywood v. Lombardi, 770 So.2d 1196, 1202 (Fla.2000)). Therefore, when the Legislature passed chapter 88-166, it presumably discerned and consulted this Court's Manaure V decision in determining the prospective effect of adding "surplus lines insurance" to the exclusionary provisions of section 627.021(2).
The relevant legislative materials and common sense also confirm the accuracy of this presumption as applied in the instant case: the Legislature knew and specifically intended that in adopting chapter 88-166, its newly enacted surplus-lines exclusionary provision (i.e., section 627.021(2)(d), Florida Statutes (Supp. 1988)) would only apply to part I of chapter 627, not chapter 627 in its entirety. See ch. 88-166 Staff Analysis at 3 ("The bill amends sections regulating the sale of surplus lines insurance, specifically exempting these lines from the rating laws. . . . [Section 2] [c]odifies the department's policy of not subjecting surplus lines insurance to the ratings laws of part I, chapter 627, F.S." (emphasis supplied)); cf. ch. 627, pt. I, Fla. Stat. (Supp.1988) ("Rates and Rating Organizations") (emphasis supplied). Under these circumstances, the staff analyses represent the clearest, most direct and most precise information available from the legislative-committee structure.
Furthermore, the structure and organization of chapter 627 support this Court's Manaure V decision and the legislative intent expressed in the Staff Analysis. Chapter 627 is divided into twenty-one parts and contains nine separate "scope of this part," "application of this part," or "scope" provisions, in addition to section 627.021, which is also entitled "Scope of this part." §§ 627.021 (emphasis supplied), 627.401, 627.451, 627.501, 627.601, 627.676, 627.801, 627.911, 627.9403, 627.981, Fla. Stat. (2003); Aramark Unif. & Career Apparel, Inc. v. Easton, 894 So.2d 20, 25 (Fla.2004) ("[I]n determining legislative intent, we must give due weight and effect to the title of the section. `The title is more than an index to what the section is about or has reference to; it is a direct statement by the legislature of its intent.'" *1044 (quoting State v. Webb, 398 So.2d 820, 824-25 (Fla.1981))).
Thus, if this Court were to read the scrivener's error literally, and thereby apply the exclusionary provisions of section 627.021(2) to all of chapter 627, it would render many of these "scope of this part" provisions superfluous and would also directly contradict the title of section 627.021: "Scope of this part." Cf. Johnson v. Feder, 485 So.2d 409, 411 (Fla.1986) ("We are compelled by well-established norms of statutory construction to choose that interpretation of statutes and rules which renders their provisions meaningful. Statutory interpretations that render statutory provisions superfluous are, and should be, disfavored." (emphasis supplied) (internal quotation marks omitted)). This undesirable result would occur under a literal reading of the scrivener's error because many of the above-cited provisions exclude the same topical items as section 627.021, which raises the question why would the Legislature exclude duplicative items under separate "scope of this part" provisions when section 627.021(2) had already done so for all of chapter 627? The simple answer is that the Legislature never intended that result, as explained by this Court in Manaure V and by the Staff Analysis addressing chapter 88-166, Laws of Florida. See Manaure V, 511 So.2d at 969-71; ch. 88-166 Staff Analysis at 4. Therefore, Essex is incorrect in the assertion that none of the statutory provisions of chapter 627 apply to surplus-lines insurance. This type of assertion directly contradicts express legislative intent and this Court's Manaure V decision. See 511 So.2d at 969-71; ch. 88-166 Staff Analysis at 4. The correct interpretation is that the exclusionary provisions of section 627.021(2) apply only to the ratings laws found in part I of chapter 627. When applied here, this holding mandates that both section 627.421 and section 627.428 apply to surplus-lines insurance because neither of those statutory sections appears in part I of chapter 627; rather, sections 627.421 and 627.428 appear in part II of that chapter.[8]See §§ 627.421 ("Delivery of policy"), 627.428 ("Attorney's fees"), Fla. Stat. (2003); see also Chacin v. Generali Assicurazioni Generali Spa, 655 So.2d 1162, 1162-63 (Fla. 3d DCA 1995) (holding that attorney's fees are awardable against surplus-lines insurers under section 627.428).

B. The Significance of Sections 626.922 and 627.421
Having reaffirmed Manaure V and its explanation of the scope of section 627.021, Florida Statutes, we now address the first certified question, which we rephrase as follows: Whether section 626.922 or section 627.421, Florida Statutes (2003), or both, require delivery of evidence of insurance directly to the insured, so that delivery to the insured's representativeacting as an independent insurance broker in the transactionis insufficient.[9] Ultimately, *1045 we answer this question in the negative and conclude that neither statute has altered the common-law presumption that an insurance representative, serving as an independent insurance broker, acts on behalf of the insured for purposes of procuring insurance coverage.

i. Lyons and its Progeny
Beginning with this Court's decision in Jefferson Standard Life Insurance Co. v. Lyons, 122 Fla. 346, 165 So. 351 (1936), lower courts have seized upon the apparent rule of law that delivery of an insurance policy to an insurance agent constitutes delivery to the insured for all purposes. See, e.g., Reliance Ins. Co. v. D'Amico, 528 So.2d 533, 534 (Fla. 2d DCA 1988) ("The fact that [the insured] may never have received a copy of the subject insurance policy because his insurance agent kept it on file for him is irrelevant because delivery of an insurance policy to an agent constitutes delivery to the insured." (citing Prudential Ins. Co. of Am. v. Latham, 207 So.2d 733 (Fla. 3d DCA 1968), which, in turn, relied upon Jefferson Standard Life Ins. Co. v. Lyons, 122 Fla. 346, 165 So. 351 (1936))). However, the actual holding of Lyons was much more narrow because it addressed "delivery" in the context of contract formation.
In particular, Lyons centered on a life-insurance coverage dispute, in which the insurer claimed that no contract had ever been formed between it and the insured. See 165 So. at 352. This case, in contrast to Lyons, does not focus on a contract-formation dispute; rather, it focuses on a situation in which an insurance contract concededly exists, but the insured disputes the fact that it received notice of certain insurance-policy exclusions. In Lyons, A.D. Lyons, the insured, purchased a life insurance policy in the sum of $1,000, payable to Martha Traylor Lyons, his wife. See 165 So. at 352. Lyons completed the application on January 6, 1933, and the insurer's Jacksonville office mailed the policy to its soliciting agent on January 13. See id. The soliciting agent received the policy on January 15 or 16, but held the policy until January 26. See id. Upon attempting delivery, the agent learned that Lyons had died earlier that same day. See id. Lyon's wife, however, tendered the first premium and continued to request delivery of the policy. The agent and insurer refused this request, and Mrs. Lyons filed a complaint seeking to require the insurer to deliver the policy. See id.
The policy application stated
that the company should incur no liability under it "unless and until (a) it has been received and approved, (b) the policy issued and actually delivered, and (c) the premium has been actually paid to and accepted by the Company, or its authorized agent," all during the lifetime of the insured and while he is in good health.
165 So. at 352 (emphasis supplied). The insurer conceded that it received and approved Lyons' application, that it refused to deliver the policy, and that it refused to accept Mrs. Lyons' tender of the first premium payment. See id. This Court held:

On the question of delivery, we do not think the company is in position to complain. When the policy was sent to the soliciting agent of the company, he became the agent of both the insurer and the insured for the purpose of delivery, and, having held it for ten or eleven days before moving to do so, we hold that delivery was in effect performed. The company should not by its conduct defeat delivery and claim an advantage by doing so.

165 So. at 353 (emphasis supplied). Thus, this Court decided Lyons solely with regard to the question of contract formation, *1046 and did not address delivery for purposes of notice of policy exclusions. When a policy-delivery dispute focuses on notice of policy exclusionsand not contract formationLyons, and cases based upon Lyons, should not control. Rather, as explained below, a well-established insurance law presumption, used in conjunction with this Court's decision in Almerico v. RLI Insurance Co., 716 So.2d 774 (Fla.1998), should resolve these types of policy-delivery notice issues.

ii. Almerico and the Common-Law Broker-Agency Presumption
The applicable presumption is commonly formulated as follows:
[A]n insurance broker acts as an agent of the insured, not the insurer, where the broker is employed by the insured to procure insurance. The presumption can be overcome by the existence of special circumstances [i.e., indicia of agency] indicating that the broker's arrangement with the insurer was not a standard relationship.

3 Russ & Segalla, supra § 45:5 (emphasis supplied) (footnotes omitted). It is important to note that "insurance broker" and "insurance agent" are not synonymous terms:
A representative of the insured is known as an "insurance broker." A broker represents the insured by acting as a middleman between the insured and the insurer, soliciting insurance from the public under no employment from any special company, and, upon securing an order, places it with a company selected by the insured, or if the insured has no preference, with a company selected by the broker. In contrast, an "insurance agent" represents an insurer under an exclusive employment agreement by the insurance company. . . . The distinction between an agent and a broker is important because acts of an agent are imputable to the insurer, and acts of a broker are imputable to the insured.

3 Russ & Segalla, supra § 45:1 (emphasis supplied) (footnotes and internal division omitted); see also Almerico, 716 So.2d at 776-78. Based on its recognition of "the sometimes amorphous nature of an insurance broker," this Court held in Almerico "that under the provisions of section 626.342(2), Florida Statutes (1989), as well as Florida's common law, civil liability may be imposed upon insurers who cloak unaffiliated insurance agents with sufficient indicia of agency to induce a reasonable person to conclude that there is an actual agency relationship." 716 So.2d at 782 n. 13, 783 (emphasis supplied).[10]
In this vein,
[c]ourts have found the existence of [indicia of agency] when the insurer characterizes the broker as a representative of the insurer, or when insurers contemplate broker solicitation of their products using the insurer's application and sales brochures. [See, e.g., Almerico, 716 So.2d at 777 ("Evidence of indicia of agency may be demonstrated if the insurer furnishes an insurance agent or agency with any blank forms, applications, stationery, or other supplies to be used in soliciting, negotiating, or effecting contracts of insurance." (internal quotation marks omitted)).] Conversion of a broker to an agent has also been found when an insurer uses a broker as an agent for a single purpose. Finally, an agent licensed to sell insurance products for a variety of insurers as an independent insurance agent, may still be *1047 considered the agent of an insurer if the insurer has a written agency appointment agreement expressly authorizing the agent to transact business on behalf of the insurer as its agent.

3 Russ & Segalla, supra § 45:5 (emphasis supplied) (footnotes omitted).
Here, the Appellees have not proffered any allegations that R.A. Brandon & Company acted as anything other than an independent insurance broker regarding the parties or transaction involved in this litigation, nor have they proffered any evidence, or even a contention, that Brandon had any contract or agreement with Essex to market and sell Essex's insurance policies. Further, the Appellees had the burden of proof on this issue. See 3 Russ & Segalla, supra § 45:10 ("An insured seeking to estop an insurer from denying coverage based on a broker's actions has the burden of proving that the broker was the agent of the insurer."). In fact, Isidoro Farji, Lighthouse's presidentwho has contacted Brandon since 1998 to obtain Lighthouse's insurance coverageindicated during his September 9, 2004, deposition that Brandon acted as Lighthouse's broker for purposes of obtaining insurance coverage concerning the 30th Court property:
Q. Did you authorize Brandon and Company to fill out an application and apply for insurance for Lighthouse Intracoastal, Inc.?
A. Yes.
Q. And did they do that to the best of your knowledge?
A. Yes.
Q. And you obtained insurance from several different insurance companies for Lighthouse Intracoastal, Inc., based on that application? . . .
A. Correct.
Dep. of Isidoro Farji at 161-62. Additionally, in reference to Maria Figuerasthe primary Brandon customer representative with whom Isidoro Farji interactedMr. Farji stated that "[s]he was getting all the policies for me." Dep. of Isidoro Farji at 188. Finally, Todd Brandonthe Executive Vice President of R.A. Brandon & Companystated during his February 1, 2005, deposition that Brandon acted as a producing or general-lines agent that approached surplus-lines agents on behalf of its clients to obtain surplus-lines coverage where general-lines coverage was unavailable, and that Brandon did not have any type of exclusive relationship with any one surplus-lines insurer. See Dep. of Todd Brandon at 11-18.
Therefore, in this case, all of the evidence offered by the parties preceding the entry of the summary judgment in favor of the Appellees indicates that Brandon, an independent insurance broker, acted as Lighthouse's insurance representative-broker for purposes of procuring insurance coverage for the 30th Court property. Relatedly, all applicable evidence indicates that it was MacDuff Underwriters, Inc., not Brandon, that acted as Essex's surplus-lines agent in Florida. See, e.g., Dep. of Jack Miller, Executive Vice President with Essex Ins. at 13; see also §§ 626.913(2), 626.914(1) Fla. Stat. (2003) (defining "surplus lines agent," and providing that surplus-lines policies are only placed in Florida "through . . . qualified, licensed, and supervised surplus lines agents resident in this state, for insurance coverages and to the extent thereof not procurable from authorized insurers" (emphasis supplied)).
In sum, under this Court's Almerico decision and under the common-law broker-agency presumption, Brandon, as an independent insurance broker in this transaction, is presumed to have acted on *1048 Lighthouse's behalf for purposes of obtaining insurance coverage. Moreover, the Appellees had the burden of rebutting this presumption by presenting some indicia of agency indicating that Brandon acted not on Lighthouse's behalf, but as an agent for and on behalf of Essex. However, the Appellees have failed to present any evidence, or even a contention, that Brandon acted as an agent for and on behalf of Essex when it received a copy of the Essex CGL policy. Therefore, under Almerico, Brandon's receipt of the Essex CGL policy constituted delivery to its principal, Lighthouse Intracoastal. See 716 So.2d at 776-82; see also 3 Russ & Segalla, supra §§ 45:5, 45:10.

iii. Sections 626.922 and 627.421 Do Not Alter the Common-Law Rule
It is a well-settled rule of Florida statutory construction that
[s]tatutes in derogation of the common law are to be construed strictly. . . . They will not be interpreted to displace the common law further than is clearly necessary. Rather, the courts will infer that such a statute was not intended to make any alteration other than was specified and plainly pronounced. A statute, therefore, designed to change the common law rule must speak in clear, unequivocal terms, for the presumption is that no change in the common law is intended unless the statute is explicit in this regard.

Carlile v. Game & Fresh Water Fish Comm'n, 354 So.2d 362, 364 (Fla.1977) (emphasis supplied). Accordingly, for either section 626.922 or section 627.421 to alter the common-law broker-agency presumption, those statutes were required to announce that intention in explicit, unequivocal terms. However, neither statute does so.
In relevant part, section 626.922(1) states that
[u]pon placing a surplus lines coverage, the surplus lines agent shall promptly issue and deliver to the insured evidence of the insurance consisting either of the policy as issued by the insurer or, if such policy is not then available, a certificate, cover note, or other confirmation of insurance. Such document shall be executed or countersigned by the surplus lines agent and shall show the description and location of the subject of the insurance; coverage, conditions, and term of the insurance; the premium and rate charged and taxes collected from the insured; and the name and address of the insured and insurer. If the direct risk is assumed by more than one insurer, the document shall state the name and address and proportion of the entire direct risk assumed by each insurer. A surplus lines agent may not delegate the duty to issue any such document to producing general lines agents without prior written authority from the surplus lines insurer. A general lines agent may issue any such document only if the agent has prior written authority from the surplus lines agent. The surplus lines agent must maintain copies of the authorization from the surplus lines insurer and the delegation to the producing general lines agent. The producing agent must maintain copies of the written delegation from the surplus lines agent and copies of any evidence of coverage or certificate of insurance which the producing agent issues or delivers. Any evidence of coverage issued by a producing agent pursuant to this section must include the name and address of the authorizing surplus lines agent.
§ 626.922(1), Fla. Stat. (2003) (emphasis supplied).
*1049 Based on the plain text of section 626.922,[11] we presume that in drafting this statute, the Legislature did not use the terms "deliver" and "issue" synonymously. See, e.g., Capers v. State, 678 So.2d 330, 332 (Fla.1996) ("It is, of course, a general principle of statutory construction that the mention of one thing implies the exclusion of another; expressio unius est exclusio alterius." (quoting Thayer v. State, 335 So.2d 815, 817 (Fla.1976))). When examining the text of section 626.922, it is apparent that the Legislature only intended to prevent surplus-lines agents from delegating "the duty to issue" surplus-lines policies. The nondelegation rule does not concern policy delivery: "A surplus lines agent may not delegate the duty to issue any such document to producing general lines agents without prior written authority from the surplus lines insurer." § 626.922(1), Fla. Stat. (2003) (emphasis supplied). Additionally, the first portion of the statute does not state the method by which a surplus-lines agent or a surplus-lines insurer may accomplish delivery of the policy: "Upon placing a surplus lines coverage, the surplus lines agent shall promptly issue and deliver to the insured evidence of the insurance consisting either of the policy as issued by the insurer or, if such policy is not then available, a certificate, cover note, or other confirmation of insurance." Id. (emphasis supplied). Delivery of the policy to the principal-insured's independent representative-broker would, therefore, remain a viable option under section 626.922(1). Consequently, where the Legislature has used the terms "issue" and "deliver" in a statute, but appears to have intentionally omitted the term "deliver" from an amended portion of the statute, which imposes a nondelegation rule, this Court will presume that the omission was intentional. See Carlile, 354 So.2d at 364-65 ("The omission of a word in the amendment of a statute will be assumed to have been intentional. And, where it is apparent that substantial portions of a statute have been omitted by process of amendment, the courts have no express or implied authority to supply omissions that are material and substantive, and not merely clerical and inconsequential.").
Finally, the penultimate portion of the statute, which deals with the records a producing agent must maintain, is just thata rule limited to record-keeping: "The producing agent must maintain copies of the written delegation from the surplus lines agent and copies of any evidence of coverage or certificate of insurance which the producing agent issues or delivers." § 626.922(1), Fla. Stat. (2003) (emphasis supplied). That sentence does not alter the fact that in imposing the policy-issuance non-delegation rule, the Legislature intentionally omitted the word "deliver." Section 626.922 thus does not unequivocally alter the common-law broker-agency presumption because the portion of the statute that Appellees rely upon for that proposition does not even mention the word "delivery."
Moreover, even if this Court were to refer to legislative materials to aid in the construction of section 626.922, those materials support our interpretation. The Senate Staff Analysis and Economic Impact Statement states that the Legislature's *1050 1998 amendment of section 626.922(1) "specifie[d] conditions under which a surplus lines agent may delegate to a producing agent the requirement to provide documentation of coverage to an insured." Fla. S. Comm. on Banking & Ins., CS for SB 1372 (1998) Staff Analysis 1 (Mar. 12, 1998) (on file with the Florida State Archives) (emphasis supplied). The Staff Analysis later denotes that the term "provide" relates to the "duty to issue any such document," and indicates that "issue" is synonymous with "bind[ing] coverage." Id. at 13 (emphasis supplied). In turn, "bind coverage" means legally obligating the insurer to provide coverage under an insurance policy. See Black's Law Dictionary 178 (8th ed.2004) ("bind, vb. 1. To impose one or more legal duties on (a person or institution) . 2. Hist. To indenture; to legally obligate to serve."). Thus, even after resorting to extrinsic legislative materials, it remains clear that section 626.922(1)'s policy-issuance nondelegation rule has nothing to do with policy "delivery," and, therefore, the common-law broker-agency presumption emerges unscathed.
Section 627.421, Florida Statutes (2003), also does not alter the common-law broker-agency presumption. That statute states in relevant part that "[s]ubject to the insurer's requirement as to payment of premium, every policy shall be mailed or delivered to the insured or to the person entitled thereto not later than 60 days after the effectuation of coverage." § 627.421(1), Fla. Stat. (2003) (emphasis supplied). Section 627.421 does not state that the phrase "to the insured or to the person entitled thereto," excludes authorized insurance representative-brokers of the principal-insured.
Therefore, where (1) a surplus-lines insurer or its direct surplus-lines agent delivers copies of an insurance policy to the representative of the insured, who is acting as an independent insurance broker in the transaction; (2) the insured disputes that it received a copy of the policy; and (3) the insured fails to present any evidence that its independent insurance representative-broker was actually acting as an agent of the insurer, the insured may not point to section 627.421 as mandating that the insurer was required to deliver a copy of the policy directly to the insured. In these types of situations, a surplus-lines insurer or its direct surplus-lines agent complies with section 627.421's command to deliver a copy of the policy "to the insured or to the person entitled thereto," by delivering a copy of the policy to the insured's undisputed, independent representative-broker (e.g., R.A. Brandon & Company in this case). See § 627.421(1), Fla. Stat. (2003). As stated above, the same result occurs under section 626.922: when a surplus-lines insurer or its direct surplus-lines agent delivers a copy of a surplus-lines policy to the insured's independent representative-broker, that delivery constitutes delivery to the insured.[12] In Almerico, we expressed the means through which an insured may overcome this general rulethe insured must present *1051 convincing indicia of agency demonstrating that the insurance broker was actually an agent of the insurer. See 716 So.2d at 782-83; see also 3 Russ & Segalla, supra §§ 45:5, 45:10. However, the Appellees have not done so in this case. Accordingly, we answer the first certified question in the negative: neither section 626.922 nor section 627.421, Florida Statutes (2003), requires delivery of evidence of insurance directly to the insured, so that delivery to the insured's independent representative-broker is insufficient. In situations such as this, delivery of a surplus-lines policy to the insured's undisputed, independent representative-broker constitutes delivery to the insured; nothing in sections 626.922 and 627.421 alters this result.

III. CONCLUSION
Due to the factual issues that remain unaddressed and undecided in the federal declaratory-judgment action, we decline to address all but one of the five certified questions. Based on the rule from Almerico and the common-law broker-agency presumption, we answer the first certified question in the negative: no language present in sections 626.922 and 627.421, Florida Statutes (2003), precludes a surplus-lines insurer or its direct surplus-lines agent from delivering a copy of the coverage documents to the insured's independent representative-broker instead of directly to the insured.
With regard to Lighthouse and Jack Farji's motion for attorney's fees under section 627.428, Florida Statutes,[13] we do not award the requested fees based exclusively on the current posture of this case. Lighthouse and Jack Farji are named insureds and could obtain an attorney's-fee award against Essex only if they obtain "a judgment or decree" in a court against Essex. See, e.g., First Fla. Auto & Home Ins. Co. v. Myrick, 969 So.2d 1121, 1124 (Fla. 2d DCA 2007) ("An insurer will owe attorney's fees to its insured where coverage is disputed and the insured prevails whether by judgment or a confession of judgment."); Ins. Co. of N. Am. v. Lexow, 937 F.2d 569, 573 (11th Cir.1991). However, since the federal final summary judgment entered in favor of the Appellees is contrary to Florida law, neither Lighthouse nor Mr. Farji have obtained a valid judgment or decree against Essex. If Lighthouse and Mr. Farji ultimately prevail in this case against Essex, the federal courts remain free to impose an award of attorney's fees in their favor. See, e.g., Trans Coastal Roofing Co. v. David Boland, Inc., 309 F.3d 758, 760-61 (11th Cir. 2002) (discussing federal-court imposition of attorney's fees under section 627.428, but ultimately certifying a question to this Court with regard to the correct interpretation of section 627.428).
It is so ordered.
WELLS, ANSTEAD, PARIENTE, QUINCE, and BELL, JJ., concur.
CANTERO, J., concurs in result only.
NOTES
[1] It remains unclear who removed the temporary guardrails from the second-floor bridge where Zota fell. Therefore, the identity of the direct tortfeasor is uncertain.
[2] Surplus-lines insurance is a type of insurance that a potential insured may obtain when the general-lines insurance market fails to provide a policy to cover the type of risk involved. See § 626.916(1)(a), Fla. Stat. (2003) (requiring that general-lines agents make a certified, diligent effort to obtain coverage from the general-lines market before resorting to the surplus-lines market). To ensure that there would be insurance companies willing to provide this type of coverage in our state, the Florida Legislature created a statutory scheme that permits out-of-state "unauthorized" insurers to provide surplus-lines coverage through in-state "surplus-lines agents," who serve as middlemen between surplus-lines insurers and "producing agents/general-lines agents," who, in turn, provide surplus-lines policies to insureds. See §§ 626.913-626.937, Fla. Stat. (2003).

For example, in this case, Lighthouse was unable to obtain a property-owner liability policy through the general-lines market, so its general-lines agentR.A. Brandon & Companywent to the surplus-lines market on Lighthouse's behalf. Brandon approached a surplus-lines agentMacDuff Underwriters, Inc.to secure a surplus-lines policy for Lighthouse. MacDuff then sought a registered surplus-lines insurerEssex Insurance Companywho was willing to provide the policy for Lighthouse.
[3] Lighthouse did not receive a copy of the policy until February 6, 2004, the day after Zota sustained her injuries, and due to a faxing error, the policy Lighthouse initially received did not contain the exclusions that Essex relies upon in this case.
[4] See Zota I, 18 Fla. L. Weekly Fed. D609, final summary judgment granted, 18 Fla. L. Weekly Fed. D611.
[5] In Zota II, the Eleventh Circuit noted that "Broward was not insured under the Essex policy and, therefore, is not eligible for attorney's fees under § 627.428" (i.e., only Lighthouse and Jack Farji (the insureds) are entitled to attorney's fees under section 627.428, Florida Statutes, assuming they prevail in this action against Essex). 466 F.3d at 990 n. 1.
[6] The Legislature subsequently renumbered section 627.7262 as section 627.4136, Florida Statutes (Supp.1992). See ch. 92-318, § 37, Laws of Fla.
[7] This surplus-lines exclusion is now found in section 627.021(2)(e), Florida Statutes (2007) (the 2003 version is identical in relevant part).
[8] Section 627.401, Florida Statutes, the "scope of this part" provision for part II of chapter 627, does not exclude surplus-lines insurance from coverage under that portion of chapter 627. See §§ 627.401-627.4302, Fla. Stat. (2003) (part II of chapter 627); but see § 627.4085, Fla. Stat. (2003) (stating that section 627.4085, entitled "Insurer name, agent name, and license identification number required on application," "does not apply to surplus lines business under the provisions of ss. 626.913-626.937"; this is the only section contained within part II of chapter 627 that excludes surplus-lines insurance and this section does not apply here).
[9] The Eleventh Circuit used the term "agent," whereas we elect to use the term "independent insurance broker." We do so because these two terms are not necessarily synonymous when used in the insurance-law context. See, e.g., 3 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 45:1 (3d ed.2007).
[10] Section 626.342(3), Florida Statutes (2003), excludes surplus-lines insurers from section 626.342(2)'s coverage, but as indicated by the emphasized language quoted above, this Court also based its holding in Almerico upon the common law.
[11] See, e.g., Fla. State Racing Comm'n v. McLaughlin, 102 So.2d 574, 576 (Fla. 1958) ("When construing a particular part of a statute[,] it is only when the language being construed in and of itself is of doubtful meaning or doubt as to its meaning is engendered by apparent inconsistency with other parts of the same or a closely related statute that any matter extrinsic [to] the statute may be considered by the Court in arriving at the meaning of the language employed by the Legislature.").
[12] We do not express an opinion as to the propriety of Brandon's alleged failure to provide a copy of the Essex CGL policy to its principal, Lighthouse Intracoastal. We do, however, take this occasion to note that whether Brandon neglected its standard practice of forwarding a copy of an insurance policy to its insured-principal is a dispute involving Lighthouse and Brandon, not Lighthouse and Essex. Cf. Romo v. Amedex Ins. Co., 930 So.2d 643, 654 (Fla. 3d DCA 2006) ("[W]here an insurance agent or broker undertakes to obtain insurance coverage for another person and fails to do so, he may be held liable for resulting damages to that person for breach of contract or negligence." (emphasis supplied) (quoting Klonis v. Armstrong, 436 So.2d 213, 216 (Fla. 1st DCA 1983))).
[13] Section 627.428(1), Florida Statutes (2007), states:

Upon the rendition of a judgment or decree by any of the courts of this state against an insurer and in favor of any named or omnibus insured or the named beneficiary under a policy or contract executed by the insurer, the trial court or, in the event of an appeal in which the insured or beneficiary prevails, the appellate court shall adjudge or decree against the insurer and in favor of the insured or beneficiary a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had.
(Emphasis supplied.)