[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 25, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-14922

_____

D. C. Docket No. 06-20618-CV-UU

FIRST SPECIALTY INSURANCE CORPORATION,

Plaintiff-Appellee,

versus

633 PARTNERS, LTD.,
BAYE CONTRACTING, INC.,
FATIMA SMITH,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(November 25, 2008)**

Before BIRCH and MARCUS, Circuit Judges, and FORRESTER,* District Judge.

_____

* Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

PER CURIAM:

633 Partners, Ltd. ("633"), Baye Contracting, Inc. ("Baye"), and Fatima Smith (collectively "Appellants") appeal the district court's decision granting summary judgment for First Specialty Insurance Corporation ("First Specialty") in a diversity declaratory judgment action regarding the scope of First Specialty's duties as 633 and Baye's insurer. Appellants contend that the district court erred by concluding that First Specialty had no duty to defend 633 and Baye in an underlying tort action and by finding that the applicable insurance binder contained an assault and battery exclusion that covered the claims of that underlying action. Additionally, Appellants assert that the district court abused its discretion by not allowing them an opportunity to respond to new arguments and facts presented in First Specialty's summary judgment reply brief. For the reasons that follow, we REVERSE the district court's order and REMAND for proceedings consistent with this opinion.

## I. BACKGROUND

A. First Specialty's Insurance Coverage

On 20 December 2001, 633 and Baye met with Thomas Kallman, a retail insurance broker, to obtain insurance coverage for a building owned and operated by them. In the course of this meeting, Kallman presented them with an insurance

2

proposal which they subsequently signed. This proposal indicated that it would be subject to policy terms and conditions and referenced an assault and battery exclusion. Later that day, 633 and Baye received a letter from Kallman's insurance agency purporting to be a binder for the policy (hereinafter referred to as the "20 December binder").[1] The binder stated that coverage would be effective beginning 31 December 2001 and gave the limits on the amount of coverage; however, it did not mention any exclusions, including for assault and battery, or any particular conditions of coverage.

On 27 December 2001, Bass Underwriters, an authorized agent of First Specialty, faxed a binder dated 26 December 2001 to Kallman (hereinafter referred to as "26 December binder"). Unlike the earlier binder, this document included a checklist of exclusions, all of which were checked, including the one for "Assault & Bat." R2-56 at 22. Though this binder did not elaborate about the scope of the assault and battery exclusion, it stated that the policy was "subject to the usual terms and conditions in addition to" the listed exclusions. Id. The binder also mentioned that coverage would commence on 31 December 2001 and that the binder would be effective until 1 March 2002 or the date a policy was issued, whichever came first.

---

[1] As discussed later in this opinion, First Specialty contends that this was not a binder but rather a notification to the companies that they were insured for particular amounts of coverage.

3

On 16 January 2002, First Specialty issued the insurance policy ("the Policy"), which still had an effective date of 31 December 2001. The Policy included an assault and battery exclusion, which stated:

> In consideration of the premium charged, it is hereby understood and agreed that this insurance does not apply to claims or "suits" for "bodily injury", [sic] "personal injury" or death caused by or arising directly or indirectly out of or from an assault or assault and battery of any nature whatsoever, whether or not committed by or at the direction of the Insured, his employees, patrons or any causes whatsoever.

R1-1, Exh. A. The Policy defined "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." Id. The term "personal injury" was not defined in the Policy, but the phrase "personal and advertising injury" specifically covered injuries resulting from a variety of offenses, including "false arrest, detention or imprisonment." Id.

B. The Underlying Action

The underlying tort claim, for which 633 and Baye sought both defense and indemnification, derived from a series of events that took place on 31 December 2001 at a building owned and operated by 633 and Baye. The basic facts of these occurrences appear to be undisputed.[2] On that date, Fatima Smith was approached by Maximo Almonte, who was then on duty as a security guard for 633 and Baye.

_____

[2] As will be discussed later on, the parties do disagree as to whether these should be viewed as a series of discrete episodes or one continuous event.

4

Almonte detained Smith in a building hallway, forced her to enter an empty, locked stairwell, dragged her down a flight of stairs, and then tried to rape and sexually assault her three separate times. These events took place over a thirty-five to forty-minute time span.

Smith subsequently sued Almonte, 633, and Baye for a number of torts.[3] Her claims against 633 and Baye included: negligence[4]; false imprisonment and assault based on respondeat superior; negligent hiring, retention and supervision resulting in false imprisonment and rape; negligent misrepresentation resulting in false imprisonment and rape; and derivative liability for Almonte's actions. She also brought claims against Almonte for assault and battery, false imprisonment, and negligent rendition of security services.

To date, Smith has proceeded to trial only against Almonte. She voluntarily dismissed the assault and battery claim pre-trial; thus the jury addressed solely the negligent rendition and false imprisonment claims. The jury found that Almonte had falsely imprisoned Smith while acting in the scope of his employment and was

---

[3] Though Smith appears to have filed a Third Amended Complaint in the underlying action, both parties appear to agree that the Second Amended Complaint should be the operative document for determining the duty to defend in this case. The district court made its findings based on this same complaint.

[4] This claim encompassed a range of different deficiencies dealing with the provision of security services, such as failure to monitor, train, and supervise security staff, failure to inform residents of the possibility of criminal attacks on the premises, and tacit approval or condoning of inappropriate actions by Almonte.

therefore liable for $5 million in damages.[5]  Smith's trial against 633 and Baye also began but the court declared a mistrial due to concerns about a potential conflict of interest between 633/Baye and First Specialty, which was defending the two companies under a reservation of rights.[6]  Those proceedings have been stayed pending the resolution of this action, and First Specialty continues to defend under a reservation of rights.

## C. Procedural History

First Specialty filed suit in March 2006 in the United States District Court for the Southern District of Florida seeking a declaratory judgment that it had no duty to defend or indemnify 633 and Baye with respect to Smith's tort suit against those two companies.  In its complaint, First Specialty alleged that the assault and battery exclusion in the Policy covered Smith's claims, and therefore that it should have no duty to indemnify or defend either of those two companies.  First Specialty subsequently moved for summary judgment, which the district court granted in part and denied in part.

In analyzing First Specialty's summary judgment motion, the district court

---

[5] It is unclear whether the jury addressed the negligent rendition claim.  The final judgment did not reference it, other than noting that Almonte committed the violation in the scope of his employment.

[6] It is undisputed that First Specialty had no duty to defend Almonte, who was not an insured under the Policy.

focused on whether Smith's claims would be covered by the language in the assault and battery exclusion. The court initially looked at whether there would be a duty to defend based solely on the allegations in the complaint, as required under Florida case law. According to the court, there was language in Smith's complaint that seemed to indicate that the false imprisonment and the assault and battery involved distinct acts.[7] Based on this language, the court concluded that First Specialty had a duty to defend on the false imprisonment claim and its related negligence claims but not on those negligence claims related to the assault and battery, since the latter group clearly "arose out of" the assault and battery.

After concluding that there was a duty to defend, the court then looked at whether there was a duty to indemnify, since it interpreted Florida case law to say that the absence of the latter would preclude the existence of the former. Because Florida law required that the duty to indemnify be determined based on the actual facts of the case, the court looked to Smith's testimony and read it to say that the false imprisonment was inherently intertwined with the assault and battery. Accordingly, the court found that First Specialty had no duty to indemnify on any of Smith's claims, since they all were covered by the assault and battery exclusion.

---

[7] In particular, paragraph 19 of Smith's second amended complaint describes how Almonte approached and detained Smith in the hallway against her will. Paragraph 20 discusses how Smith was sexually assaulted and subjected to verbal and physical abuse "[s]ubsequent to the initial detention." R2-40 at 3.

As a result, all of Smith's claims would be precluded from coverage. After reaching this conclusion, the court noted that there were disputed issues of fact regarding whether the policy in effect at the time of Smith's incident included the assault and battery exclusion. The court therefore denied without prejudice First Specialty's summary judgment motion on that issue and granted Appellants leave to conduct further discovery solely on that topic.

In the midst of the initial summary judgment briefing, Appellants filed a motion to strike, contending that First Specialty's references to Smith's testimony constituted raising of new factual issues in a reply brief, since First Specialty had not referenced the testimony previously. They requested that the court either strike this new material or deny the summary judgment motion and allow them a chance to respond to this new evidence. The court rejected their claim, determining that First Specialty had not raised a new issue but rather was citing the testimony as evidence to rebut Appellants' assertion that the false imprisonment and assault and battery were independent.

After discovery, First Specialty again moved for summary judgment, which the court granted. The court initially found that there was no genuine issue of material fact regarding whether the 26 December binder was in force at the time of the incident since there was no evidence that Kallman had actual or apparent

8

authority to issue the 20 December binder on behalf of First Specialty. That binder thus was not enforceable against First Specialty. Additionally, the court found that the assault and battery exclusion in the Policy applied to Smith's incident based on provisions in the 26 December binder. As a result, the court determined that all of Smith's claims fell under the assault and battery exclusion, which meant First Specialty had no duty to defend or indemnify 633 and Baye on any of the claims. Based on this conclusion, the court granted First Specialty's motion for summary judgment.[8] 633, Baye, and Smith now appeal this order.

## II. DISCUSSION

Appellants raise three issues on appeal: (1) whether the district court erred by looking at facts not included in Smith's complaint in determining whether First Specialty had a duty to defend; (2) whether the district court abused its discretion by granting summary judgment without allowing Appellants the opportunity to respond to new material in First Specialty's reply brief; (3) whether the district court erred by finding that the 26 December binder was in effect and that it included the same assault and battery exclusion listed in the Policy.

A. Duty to Defend

We review a district court's grant of summary judgment de novo and apply

---

[8] Appellants subsequently filed a motion for rehearing and/or to alter or amend the judgment, which the court rejected. This decision has not been appealed.

9

the same legal standards the district court used. See Smith v. Allen, 502 F.3d 1255, 1265 (11th Cir. 2007). Summary judgment would be appropriate where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c). In making this determination, "[w]e draw all factual inferences in a light most favorable to the non-moving party." Smith, 502 F.3d at 1265.

Under Florida law[9], "[i]t is well settled that an insurer's duty to defend its insured against a legal action arises when the complaint alleges facts that fairly and potentially bring the suit within policy coverage." Jones v. Florida Ins. Guar. Ass'n, Inc., 908 So. 2d 435, 442–43 (Fla. 2005). Courts thus must determine the existence of a duty to defend based solely on the allegations in the complaint, with all doubts resolved in favor of the insured. See id. at 443. The Florida Supreme Court has found the duty to defend is both distinct from and broader than the duty to indemnify, meaning that insurers are obligated to defend even if the allegations in the complaint are inconsistent with the actual facts or completely meritless. See id. This duty would extend to all claims, even those not within the scope of coverage. See Baron Oil Co. v. Nationwide Mut. Fire Ins. Co., 470 So. 2d 810,

---

[9] As the district court's jurisdiction was premised on diversity, we apply Florida substantive law to this action. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 822 (1938).

813–14 (Fla. Dist. Ct. App. 1985).

Based on these principles, we must determine whether the district court correctly concluded that First Specialty had no duty to defend, either because it had no duty to indemnify or on some other grounds. See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001) (noting that a district court's decision could be affirmed "on any ground that finds support in the record") (quotation marks and citation omitted). First Specialty identifies three bases for affirming the district court's grant of summary judgment on the issue of duty to defend. First, it contends that there was no duty to defend based on the facts alleged in Smith's complaint. Second, it asserts that even if there was a duty to defend based on the facts in the complaint, the actual facts showed that Smith's allegations only involved non-covered claims for which there was no possibility of recovery. Third, it contends that the court's finding of no duty constituted harmless error because First Specialty continued to defend 633 and Baye throughout the underlying litigation. We will address these arguments in turn.

1. Existence of a Duty to Defend

We must first examine whether Smith alleged facts in her complaint that would give rise to a duty to defend under the Policy. The only way that such a duty would not exist is if all of the claims fell under the assault and battery

11

exclusion.[10] See State Farm Fire & Cas. Co. v. Tippett, 864 So. 2d 31, 35 (Fla. Dist. Ct. App. 2003) (noting that "if the pleadings show the applicability of a policy exclusion, the insurer has no duty to defend"). This exclusion covered all claims "for 'bodily injury' [or] 'personal injury'" that were "caused by or ar[ose] directly or indirectly out of or from an assault or assault and battery of any nature whatsoever." R1-1, Exh. A. Florida courts have interpreted the phrase "arising out of" to mean something broader than pure causation and closer to "'originating from,' . . . 'incident to' or 'having a connection with.'" Taurus Holdings, Inc. v. United States Fid. & Guar. Co., 913 So. 2d 528, 539 (Fla. 2005).

As the district court correctly noted, Smith's claims can essentially be separated into two different categories — those connected to the assault and battery and those related to the false imprisonment. Of these two groups, only the false imprisonment claims could serve as a potential basis for a duty to defend. The negligence claims connected solely to the assault would necessarily "hav[e] a connection with" that crime and thus would "arise out of" the assault pursuant to how Florida courts have interpreted that phrase. Id. at 539. This interpretation accords with how Florida courts generally have treated negligence claims relating

---

[10] We note that the scope and applicability of this exclusion to these parties is also an issue on appeal. For this portion of the opinion, we will assume that the assault and battery exclusion included in the Policy should control. If First Specialty had a duty to defend under this exclusion, it would obviously also have one under any narrower exclusion.

12

to assaults. See, e.g., Miami Beach Entm't Inc. v. First Oak Brook Corp. Syndicate, 682 So. 2d 161, 162 (Fla. Dist. Ct. App. 1996); Britamco Underwriter's, Inc. v. Zuma Corp., 576 So. 2d 965, 965 (Fla. Dist. Ct. App. 1991). There is one Florida case, Mactown, Inc. v. Continental Ins. Co., 716 So. 2d 289 (Fla. Dist. Ct. App. 1998), which rejected applying an assault and battery exclusion to a negligence claim. That decision, however, was premised on the fact that the exclusion also referenced a number of other intentional torts, which the court read to create ambiguity regarding the exclusion's applicability to negligence-based torts. See id. at 291–92. Here, though, the exclusion is focused on only one tort and appears to encompass all claims related to that tort, regardless of whether they are intentional or not. Accordingly, if there is a duty to defend in this case, it would have to derive from Smith's claims relating to the imprisonment.

Under the Policy, all false imprisonment claims are covered, subject to any exclusions, as part of the larger category of "personal and advertising injury." First Specialty contends that Smith's false imprisonment claims should not be covered because they would fall under the ambit of the assault and battery exclusion as a form of "personal injury" that arose out of an assault or battery. As previously noted, the Policy does not define the term "personal injury." Since the use of quotation marks around a phrase in an insurance policy identifies it as an official

13

term of that policy, we need to define "personal injury" to discern the full meaning of the Policy. We agree with the district court that there is no ambiguity between the terms "personal injury" and "personal and advertising injury" and that the only plausible interpretation is to treat "personal injury" as part of "personal and advertising injury" rather than as a distinct concept. Based on this reading, the assault and battery exclusion would bar all claims alleging injury arising out of a false imprisonment that are "caused by or aris[e] directly or indirectly out of or from an assault or assault and battery of any nature whatsoever." R1-1, Exh. A.

In determining whether Smith's claims related to the false imprisonment would fall under this interpretation of the exclusion, we look only at the text of the complaint. See Jones, 908 So. 2d at 443. Appellants assert that the complaint describes the false imprisonment as a separate and distinct event from the assault. In particular, they focus on paragraphs 19 and 20 of Smith's Second Amended Complaint, which state, in relevant part:

> 19. On December 31, 2001, . . . Plaintiff FATIMA SMITH . . . was detained in the hallway by the security guard (ALMONTE) who then required her to enter an empty, locked stairwell. This detention was against Plaintiff, FATIMA SMITH'S will.
>
> 20. Subsequent to the initial detention Plaintiff FATIMA SMITH was subjected to verbal and physical threats, abuse and indignities. FATIMA SMITH was placed in immediate fear of her person and safety. FATIMA SMITH was sexually assaulted and raped against her will, and in violation of all laws and human decency.

14

R2-40 at 3. They also emphasize that the counts in Smith's complaint describing her false imprisonment do not reference the assault at all. However, as First Specialty notes, those allegations all discuss pain, suffering, and bodily injury resulting from the false imprisonment, which would seem to have to result logically from some form of assault and battery.[11]

After examining the underlying complaint, we agree with the district court's finding that the allegations contained within are sufficient to create a duty to defend. The district court focused principally on the complaint's description of the sexual assault as an event "subsequent to" the initial false imprisonment, which the court believed showed that these were two separate events and that the false imprisonment could not have arisen out of the assault. Based on our own analysis, we find it reasonable to read the pleadings as depicting Smith's false imprisonment as a distinct, preceding incident that did not necessarily have to result in her assault and battery, even if that was a potential outcome. In particular, we note that the

---

[11] For example, paragraph 26 states:

> As a direct and proximate result of Defendant ALMONTE's false imprisonment, Plaintiff FATIMA SMITH sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment. The damages, injuries and losses are permanent and continuing in nature and Plaintiff will suffer the losses and impairment in the future.

Id. at 4–5.

15

complaint repeatedly discussed the assault as a separate event later in time than the original false imprisonment, as evidenced by the "subsequent to" language referenced by the district court and by references to the assault occurring "at some point after the initial detention." R1-9, Exh. A at 12. Though temporal displacement does not automatically imply narrative disjunction, it provides a basis for differentiating between the two events, especially since the complaint lacks any clear evidence of connectedness. Accordingly, we find that Smith's complaint did not allege that her false imprisonment arose out of, originated from, or was connected with an assault or battery, and thus those claims relating to the false imprisonment would not fall under the assault and battery exclusion.

We acknowledge that this conclusion is somewhat technical and that alternate interpretations, such as First Specialty's, also would be reasonable. In particular, we agree that bodily injury typically would not result from an act of false imprisonment absent some form of assault or battery.[12] However, a false imprisonment by itself could create a bodily injury, and an assault or battery is not a necessary precondition for such an injury. We thus have a situation in which

---

[12] Smith's deposition testimony may support this reading, since it seems to describe her interaction with Almonte as one long encounter that included both sexual assault and false imprisonment rather than as separate and discrete incidents. However, the duty to defend derives exclusively from the allegations in the complaint and other pleadings, so these statements do not affect our analysis of that duty, though they would be applicable in determining the existence of a duty to indemnify. See Jones, 908 So. 2d at 442–43.

16

there are plausible readings supporting and rejecting a duty to defend based on the applicability of the exclusion.[13] Under Florida law, "[i]f the allegations of the complaint leave any doubt regarding the duty to defend, the question must be resolved in favor of the insured requiring the insurer to defend." Baron Oil, 470 So. 2d at 814. We therefore conclude that, in the absence of any clear evidence to the contrary, First Specialty had a duty to defend 633 and Baye on all of Smith's claims, even those unrelated to false imprisonment. See id. at 813–14 ("[I]f the complaint alleges facts showing two or more grounds for liability, one being within the insurance coverage and the other not, the insurer is obligated to defend the entire suit.").

2. Duty to Defend v. Duty to Indemnify

The district court agreed that First Specialty had this duty to defend, but also determined that the duty to defend should stop once the actual facts of the case showed that there was no possibility for coverage, i.e., when it had no duty to indemnify. We find that this rationale is not a valid basis for finding no duty to defend and thus conclude that the district court should not have addressed the issue. The district court cited a number of cases in support of its approach, though only two involved the application of Florida law — Underwriters at Lloyds

_____

[13] The plausibility of the pro-duty reading can be seen in the district court's decision, which accepts that argument after engaging in a detailed analysis.

17

London v. STD Enters., Inc. (Underwriters), 395 F. Supp. 2d 1142 (M.D. Fla. 2005) and Nationwide Mutual Fire Ins. Co. v. Keen (Keen), 658 So. 2d 1101 (Fla. Dist. Ct. App. 1995). Both of these cases depart from the general principle of determining the duty to defend only from the allegations in the complaint and are also readily distinguishable from the present case.

Underwriters and Keen both involve underlying complaints that omitted a reference to an uncontroverted fact that, if pled, would have placed the claim clearly outside the scope of coverage. In Underwriters, for example, the underlying suit involved an employee seeking damages from his employer for an injury in an car accident. See Underwriters, 395 F. Supp. 2d at 1144. The employer's insurance policy contained a cross-liability exclusion, which disclaimed coverage for suits brought by one insured party against another under that policy. See id. The employee failed to mention in his complaint that he was using the vehicle for business purposes, a fact that would have barred coverage under the exclusion. See id. at 1146. Neither party disputed this fact and the employee's deposition testimony clearly supported its veracity. See id. at 1150. As a result, the court determined that, though there would have been a duty to defend looking exclusively at the complaint, the absence of any possibility for coverage under the policy eliminated this duty. See id. In Keen, the underlying

18

plaintiff was piloting a water craft which used an engine that was too powerful to be covered under the insurance policy. See Keen, 658 So. 2d at 1102–03. He presented no evidence to dispute this characterization and conceded that the craft had a non-covered engine. See id. Based on these facts, the court found it appropriate to relieve the insurer of its duty to defend. See id. at 1103.

Apart from the situations in Keen and Underwriters, Florida courts have focused exclusively on the facts of the complaint in determining the duty to defend, regardless of post-complaint developments.[14] They have deemed these facts to control even "[w]hen the actual facts are inconsistent with the allegations in the complaint." See Jones, 908 So. 2d at 443 (quotation marks and citation omitted). Additionally, once a court finds that there is a duty to defend, it will "continue[] even though it is ultimately determined that the alleged cause of action is groundless and no liability is found within the policy provisions defining coverage." Baron Oil, 470 So. 2d at 814. Against this backdrop, Keen and Underwriters are best seen as exceptional cases in which courts have crafted an equitable remedy when it is manifestly obvious to all involved that the actual facts

---

[14] There are instances in which Florida courts have reached similar equitable results as Underwriters and Keen based on facts outside of the complaint, but those courts found no initial duty to defend rather than that the duty to defend was eliminated by the new facts. See, e.g., Wilson ex rel. Estate of Wilson v. General Tavern Corp., 469 F. Supp. 2d 1214, 1220–21 (S.D. Fla. 2006) (finding no duty to defend when the underlying plaintiff deliberately failed to mention a fact in order to "plead into coverage").

19

placed the claims outside the scope of coverage.[15]  See Sphinx Int'l, Inc. v.

National Union Fire Ins. Co. of Pittsburgh, Pa., 226 F. Supp. 2d 1326, 1338 (M.D.

Fla. 2002) (deeming Keen to be "an apparent aberration").

To the extent that Florida law permits a equitable departure from the general

treatment of a duty to defend, it would not apply in this case.  The court in Keen

indicated that this relief would only be proper "if uncontroverted evidence places

the claim outside of coverage, and the claimant makes no attempt to plead the fact

creating coverage or suggest the existence of evidence establishing coverage."[16]

Keen, 658 So. 2d at 1103.  Here Appellants explicitly contest the district court's

finding that the false imprisonment and the assault and battery are so inherently

---

[15] The other case cited by First Specialty as interpreting Florida law to defeat an existing duty to defend would fall under the same descriptor.  See Prime Ins. Syndicate, Inc. v. Soil Tech Distribs., 2006 WL 1823562 (M.D. Fla. June 30, 2006).  Like Underwriters, that case involved a cross-liability exclusion that would have applied to the actual facts but not to what was alleged in the complaint.  See id.  Given that neither party disputed these facts, this also represented a situation in which it was obvious to all that there was no potential for coverage.  See id. at *5–7.

Additionally, we note that even this exception is not universally applied throughout Florida.  In Baron Oil, for example, both parties conceded that the plaintiff suing Baron in the underlying suit was an employee of the company — a fact which triggered an exclusion in Baron's insurance policy.  See Baron Oil, 470 So. 2d at 811–12.  However, the complaint itself did not mention this fact and the court thus found that the insurer had a duty to defend even when the actual facts clearly showed that the claims were not covered.  See id. at 814.

[16] This characterization is also consistent with the non-Florida decisions cited by the district court, all of which find the duty to defend to have been eliminated when the actual facts indisputably show that there is no possibility of coverage.  See, e.g., Liberty Mut. Ins. Co. v. FAG Bearings Corp., 153 F.3d 919, 924 (8th Cir. 1998); Conway Chevrolet Buick, Inc. v. Travelers Indem. Co., 136 F.3d 210, 214 (1st Cir. 1998); North Bank v. Cincinnati Ins. Cos., 125 F.3d 983, 986 (6th Cir. 1997); Snug Harbor, Ltd. v. Zurich Ins., 968 F.2d 538, 545 (5th Cir. 1992).

20

intertwined as make the former arise out of the latter.  In addition, Smith pled sufficient evidence to support a finding of coverage based on a separate and distinct incident of false imprisonment, and, unlike the parties in Underwriters and Keen, she did not omit any crucial facts that would have taken her claims outside the scope of coverage.  We therefore find that there was no basis for the district court to conclude that First Specialty had no duty to defend based on facts outside those alleged in the complaint.

### 3. Harmless Error

First Specialty also asserts that even if the district court erred in concluding that there was no duty to defend, the error was harmless.  In particular, it notes that it has continued to defend 633 and Baye at all times in the state court proceedings.  However, all parties agree that the state court action against 633 and Baye remains pending, which means that they are still in need of a defense.  In the absence of a court order determining the existence of a duty to defend, First Specialty could refuse to provide such a defense.  Additionally, First Specialty has entered into a settlement agreement pursuant to which it will pay Smith, 633 and Baye amounts that depend on the outcome of this declaratory action.  Accordingly, we reject First Specialty's contention that the district court's duty to defend finding could

21

constitute harmless error.[17]

B. Issues Related to Duty to Indemnify

Though our finding that First Specialty had a duty to defend 633 and Baye provides sufficient grounds for reversal of the district court's summary judgment order, the district court on remand still must address the issue of duty to indemnify in light of our findings regarding the duty to defend. In order to facilitate this determination, we will address the two other issues Appellants raise on appeal, both of which affect the inquiry on the duty to indemnify. First, Appellants contend that the district court erred by failing to provide them the opportunity to rebut newly-presented evidence discussed in First Specialty's reply brief in support of its summary judgment motion. Second, they assert that the assault and battery exclusion should not have been included in the Policy as a matter of law. We address these arguments in turn.

1. Opportunity to Rebut Smith's Deposition Testimony

After First Specialty submitted its summary judgment reply brief to the district court, Appellants argued that it had raised a new argument for the first time on appeal and requested the opportunity to respond or to conduct additional

---

[17] This action would not be moot for the same reasons that the duty-to-defend finding would not be harmless error.

22

discovery, pursuant to Rule 56(f).[18]  In particular, they objected to the use of

Smith's deposition testimony from the underlying suit.  The district court rejected

the request, determining that First Specialty merely had responded to arguments

raised in Appellants' opposition to First Specialty's initial summary judgment

motion.  The court, in a later order on the first summary judgment motion, also

concluded that additional discovery would be unnecessary and unhelpful since

Smith's counsel in the underlying action was acting as the counsel for 633 and

Baye in this case and thus would be unable to rebut Smith's testimony.

We review the denial of a motion for leave to conduct limited discovery

under Rule 56(f) for abuse of discretion.  See Shuford v. Fidelity Nat'l Prop. &

Cas. Ins. Co., 508 F.3d 1337, 1341 (11th Cir. 2007).  The district court's ruling

will be reversed only if the moving party establishes that the ruling resulted in a

"substantial prejudicial effect."  Alexander v. Fulton County, Ga., 207 F.3d 1303,

1326 (11th Cir. 2000) (quotation marks omitted).  "When employing an abuse of

discretion standard, we must affirm unless we at least determine that the district

court has made a clear error of judgment, or has applied an incorrect legal

standard."  Id. (quotation marks omitted).

A district court's decision to permit the filing of a surreply is purely

_____

[18] Appellants stylized this as a motion to strike, but the district court properly treated it as a motion for leave to file surreply instead.

discretionary and should generally only be allowed when "a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief." Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005). Our sister circuits have held that a district court can abuse its discretion by failing to give the opposing party a chance to respond to materials presented for the first time in a reply brief and instead granting summary judgment on the basis of that evidence. See, e.g., Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1139 n.13 (10th Cir. 2003) (finding that the district court "abused its discretion to the extent it relied on new evidentiary materials presented for the first time in" a summary judgment reply brief); Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996) (determining that the district court should have given the non-moving party an opportunity to respond to new evidence raised in the reply to a motion for summary judgment). Additionally, under the applicable local rules, the district court can authorize the filing of a surreply only to rebut matters raised in an opposing pleading.

After examining the evidence, we find that the district court acted within its discretion in denying Appellants' request to file a surreply. We see no basis for treating the references in First Specialty's reply brief to Smith's testimony from the underlying suit as "new" evidence. As the district court noted, First Specialty

24

referred to this testimony to respond to Appellants' assertion that the false imprisonment and assault constituted separate events rather than as a means to make a wholly new argument.[19] Since Appellants' counsel participated in the underlying case, they cannot claim surprise or lack of knowledge. Appellants assert that they could have raised new evidence to rebut Smith's deposition testimony, namely the verdict forms from the underlying suit and affidavits from Smith clarifying her testimony. Based on our review of the evidence, we find it unlikely that these documents would be either helpful or persuasive to the district court. A verdict form alone tells us nothing about the jury's view on whether the false imprisonment and assault were distinct events. An affidavit from Smith would be unlikely to add anything to her testimony, which is fairly clear in its description of the events. There would thus seem to be little basis for the district court to need to permit further discovery. Additionally, any evidence they offered would not meet the local requirement that it be used to rebut newly raised arguments. For all of these reasons, we find that the district court did not abuse its discretion in denying Appellants' motion.

2. Applicability of Assault and Battery Exclusion

---

[19] Appellants' briefs on appeal discuss multiple legal arguments they could have raised to rebut First Specialty's use of the testimony, such as the concurrent cause doctrine. However, these all appear to be just further elaborations on their "separate and distinct events" argument.

Appellants make two arguments as to why the assault and battery exclusion contained in the Policy should not apply to Smith's underlying suit as a matter of law. First, they contend that there is a genuine issue of material fact regarding whether the 20 December binder or 26 December binder was in effect at the time of the incident involving Smith. Second, they assert that, even if the 26 December binder applied, the assault and battery exclusion included in the Policy was not a "usual term" of a First Specialty policy and was ambiguous; thus it should not be incorporated into the binder. We review both of these claims de novo. See Michigan Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915, 924 (11th Cir. 1998) (noting that "where a district court interprets an insurance policy as a matter of law, the district court's construction of the policy is subject to de novo review").

Appellants contend that the 20 December binder should be binding on First Specialty because Kallman had the authority to issue the binder for First Specialty. "Florida case law provides that an insurer may be held accountable for the actions of those whom it cloaks with 'apparent agency'." Almerico v. RLI Ins. Co., 716 So. 2d 774, 777 (Fla. 1998). Florida courts "have applied a three-prong test under general agency law in order to determine the existence of apparent agency: first, whether there was a representation by the principal; second, whether a third party relied on that representation; and, finally, whether the third party changed position

26

in reliance upon the representation and suffered detriment." Id. First Specialty

does not dispute that the latter two prongs would be met here, since 633 and Baye

relied on Kallman's authority and changed their position based on that reliance.

However, it does not appear that First Specialty ever represented that Kallman was

acting as its agent. Appellants point to testimony by Kallman which seemed to

indicate that the 20 December binder could only have been issued with First

Specialty's approval.[20] However, those statements were about the general practice

of issuing binders and specifically contradict Kallman's statement that his

company did not have binding authority from First Specialty and probably should

not have issued the 20 December binder. Based on this testimony, we agree with

the district court's conclusion that there was no genuine issue of material fact

regarding whether First Specialty had authorized Kallman to act as its agent. As a

result, there is no basis under Florida law for finding Kallman to have apparent

authority to bind First Specialty based on the 20 December binder.[21] Accordingly,

the 26 December binder, which was issued by First Specialty rather than Kallman,

---

[20] In particular, he noted that his company's procedure was to "never [issue a binder] without knowing the coverage was bound" and that they would "call[] the broker [or do] whatever we needed to do to put the coverage into place." R2-56 at 14. Later in his testimony, he stated that if his company had issued a document looking like the 20 December binder, then they "would have called the broker." Id. at 20.

[21] Since we make this finding, we do not need to address Appellants' argument that First Specialty failed to provide 633 and Baye with actual notice of the intent to modify the 20 December binder before issuing the 26 December binder.

27

would be the operative binder here.[22]

We also reject Appellants' assertion that the 26 December binder should not include the assault and battery exclusion from the Policy. Under Florida law, insurance binders "include all the usual terms of the policy as to which the binder was given together with such applicable endorsements as are designated in the binder, except as superseded by the clear and express terms of the binder." Fla. Stat. § 627.420. As a result, binders can be enforceable before the issuance of the insurance policy. See Gas Kwick, Inc. v. United Pac. Ins. Co., 58 F.3d 1536, 1540 (11th Cir. 1995) (noting that Florida law permits binder-based enforceability to let "[i]nsured parties benefit from having an early effective date while the policy is in the process of being issued"). Accordingly, the assault and battery exclusion included in the Policy would be enforceable against 633 and Baye if it was either a "usual term" of the policy or an applicable endorsement designated in the binder.

Based on the evidence presented, we find that the assault and battery exclusion would be a usual term of the policy. First Specialty provided an affidavit

---

[22] Appellants also assert that the 26 December binder should not apply because First Specialty violated the Florida statute requiring insurers to mail insurance binders directly to their insured. See Fla. Stat. § 626.922(1) (2008). However, the case they cited for this proposition has since been overturned by the Florida Supreme Court, which instead held that an insured party could not use that section to require personal delivery of copies of the policy if the insurer gave copies to an independent insurance broker and the insured showed no evidence that the broker was acting as an agent of the insurer. See Essex Ins. Co. v. Zota, 985 So. 2d 1036, 1050 (Fla. 2008). Since Kallman was not acting as First Specialty's agent, 633 and Baye could not use this statute as the basis for their objection.

from its vice president indicating that the assault and battery exclusion included in the Policy "was the only assault and battery exclusion used by First Specialty on policies issued by General Binding Authority agents." R2-59, Exh. B. at 2. Appellants contend that this statement does not prove that the exclusion was a "usual term" of First Specialty's commercial liability policies because there is no indication that the exclusion was commonly included in all of its policies. Though we could find no Florida case law addressing what would constitute a "usual term," the language in § 627.420 discussing "the usual terms of the policy as to which the binder was given" appears to contemplate that it would be "usual" for the specific type of policy being issued rather than for all policies in general. See Fla. Stat. § 627.420 (emphasis added). Since First Specialty adequately showed that it traditionally included such an exclusion in similar policies and Appellants have not put forward any evidence to raise an genuine issue of material fact on the issue, we find that it would be a "usual term" of the policy.

The assault and battery exclusion would also qualify for inclusion as an applicable endorsement designated in the binder. The 26 December binder expressly noted that it was being issued "subject to the usual terms and conditions." R2-56 at 20. Appellants assert that this language is insufficient to incorporate the exclusion from the Policy because it is ambiguous as to what kind

of assault and battery exclusion applies. In support of this argument, they reference a Missouri case in which the court found that a similar reference in a binder did not incorporate the assault and battery exclusion from the subsequent policy because the surplus lines industry utilized two different variations of that exclusion and the binder did not identify which would be applicable. See Alea London Ltd. v. Bono-Soltysiak Enters., 186 S.W. 3d 403, 412–13 (Mo. Ct. App. 2006). In addition to the fact that we are not bound by Missouri law, we find the decision to be distinguishable from the present case. That court's decision was predicated on the fact that the binder referenced an assault and battery exclusion but "did not contain express language subjecting it to the language in the policy." Id. at 412. Moreover, the court refused to read the binder to impliedly incorporate a particular exclusion because both of the prevailing types of assault and battery exclusions were included in the policy and attached documents — a narrow exclusion in the body of the policy and a broader one in the endorsement. See id. at 413. The failure to make such a distinction rendered the binder ambiguous, thus meaning that the terms of the exclusion would be construed against the insurer.[23]

---

[23] According to the court, the "narrow" exclusion "would typically exclude acts of the insured's employees, rather than patrons" whereas the "broad" exclusion "excludes liability from injuries expected or intended by the insured as well as injuries arising from assault and battery regardless of who committed the act or whether expected or intended by the insured." Id. The ambiguity was enhanced in Alea London since the broad exclusion in the endorsement purported to replace the narrow exclusion in the policy body. See id. at 408.

See id.

Here, in contrast to Alea London, First Specialty's binder specifically indicated that it would be subject to the usual policy terms, the Policy itself contained just a single version of the assault and battery exclusion, which was a usual term of such policies, and Appellants have failed to put forward any evidence that other variations of the exclusion could have been applicable. Since there is no conflict between the terms of the binder and those in the standard policy, there thus would be no ambiguity regarding the content of the applicable assault and battery exclusion. See id. at 412 (noting that ambiguity could still result "if the terms of a binder conflict with the terms of the standard policy" even if the binder incorporated a policy term) (quotation marks omitted).

Accordingly, we find that the district court did not err in any of its findings regarding the binders and assault and battery exclusion. The 26 December binder was the operative binder since Kallman had no authority to bind First Specialty with the 20 December document. Additionally, the assault and battery exclusion in the Policy was incorporated into the 26 December binder both as a usual term of the policy and by an endorsement in the binder. As a result, the 26 December binder is the operative document for assessing the duties to indemnify and defend and would include the assault and battery exclusion from the later-issued policy.

### III. CONCLUSION

Baye, 633, and Smith appeal the district court's grant of summary judgment based on a determination that First Specialty had no duty to defend or indemnify 633 and Baye in an underlying suit involving Smith. In determining the scope of the duty to defend, the district court incorrectly looked to the actual facts of the case rather than the allegations of the complaint, which were sufficient to create such a duty under the Policy. We thus find that the district court should not have granted summary judgment on those grounds, although the court correctly determined that 633 and Baye were not entitled to an opportunity to respond to First Specialty's summary judgment reply brief and that the assault and battery exclusion in the Policy was applicable. For the foregoing reasons, we REVERSE the district court's order of summary judgment and REMAND for further proceedings consistent with this opinion.

**REVERSED AND REMANDED**.